**Walter HASENEI and Thelma Hasenei**

v.

**UNITED STATES of America.**

**Civ. No. K–80–2339.**

United States District Court,
D. Maryland.

April 8, 1982.

1000

David Saltzman, Baltimore, Md., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Lawrence A. Klinger and Orlando R. Ruiz, U. S. Dept. of Justice, Washington, D. C., and J. Frederick Motz, U. S. Atty., and Ellen L. Hollander, Asst. U. S. Atty., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, Chief Judge.

Plaintiffs Walter and Thelma Hasenei claim damages against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671–2680, for injuries sustained by them when their car collided head-on with a car driven by John D. Hock, a veteran of the United States Army, on August 21, 1976, in Adams County, Pennsylvania, near Gettysburg. Hock died in the accident. At the time of the collision, Hock was driving his car on the wrong side of the road with his headlights off. Furthermore, a blood test subsequently performed indicated that Hock had a blood alcohol content of 250 mg. per liter.

Plaintiffs allege that a Veterans' Administration ("VA") psychiatrist negligently permitted Hock to leave the VA Outpatient Clinic in Harrisburg, Pennsylvania on August 9, 1976. Plaintiffs, in so alleging, contend that the psychiatrist knew or should have known that Hock was an alcoholic who was incapable of safely operating a motor vehicle while drinking and that Hock was a person with suicidal tendencies who presented a danger to himself and to others. That psychiatrist, say plaintiffs, should have attempted to hospitalize Hock, either voluntarily or involuntarily, or at a minimum should have provided to Hock proper medication and follow-up care. Further, plaintiffs claim that defendant should have notified the Pennsylvania Department of Motor Vehicles ("DMV") that Hock was incapable of safely operating a motor vehicle so that, if appropriate, that Department could have taken steps to prevent Hock from driving.

*Facts*

The following facts are hereby found by this Court, following trial: On January 28, 1976, Hock was voluntarily admitted to the Walter Reed Army Medical Center ("Walter Reed") in Washington, D. C., after being referred to that facility by the Mental Hygiene Clinic at Ft. Ritchie, Maryland. Doctors at Walter Reed described Hock as a person who had enlisted in the Army in August 1970 with the hope of becoming a helicopter pilot and getting killed in Vietnam, but who later became bored with helicopter training and dropped out. Hock was diagnosed as suffering from alcoholism and schizophrenia, paranoid type. Hock had been a heavy drinker for five to seven years prior to his admission to Walter Reed and at that time consumed at least one gallon of bourbon per week at home and in addition spent two to six nights every week drinking in various bars. Hock also had a history of violent and irrational behavior while intoxicated—a history which included threatening his wife with a knife, getting into fights in hopes of getting killed, burning a bar from which he had been ejected and breaking a window in a liquor store which would not open after hours to sell him alcohol. Hock's wife had left him on several occasions because of physical abuse. Before entering Walter Reed, Hock had had one prior hospitalization for drinking, but had never been maintained on any kind of a formal program involving psychiatric care or alcohol counseling.

On January 20, 1976, Hock reportedly came home intoxicated, took out his gun, put the gun to his head and cocked it. His wife then took the gun away from him and put him to bed. Hock was subsequently completely amnesiac about the episode. However, after a long talk with a friend who was a reformed alcoholic, Hock voluntarily sought help at Ft. Ritchie where he was referred to Walter Reed.

Prior to his admission to Walter Reed, Hock was despondent and felt that something needed to be done to help him change his life. At Walter Reed, Hock indicated that he would try once more to solve his drinking problem and improve his life, but that if he failed this time he would obtain money illegally and injure or kill others if necessary to accomplish what he wanted. Hock stated that he had always been dissatisfied with his life, that he had always been bored and that he had never been able to tolerate a job for more than a short period. He also stated that he felt totally worthless and had long wanted to commit suicide, but that, since he believed in reincarnation, he had not committed suicide because thereafter he would have had to go through the same misery again. Hock stated that he frequently felt that people were watching him and talking about him behind his back. In the year prior to his admission to Walter Reed, Hock had had several experiences with "astral projection" and auditory hallucinations in which dead members of his family had appeared and spoken to him. Hock described severe feelings of isolation and of difficulty being around others. Hock indicated that he had fantasized about murdering persons in positions of authority. Although Hock denied ever having taken any concrete steps to commit murder, he stated that he feared that someday he would lose control of himself and injure himself or others.

Doctors at Walter Reed considered Hock's intelligence to be above normal. Hock appeared to those doctors to be well-oriented as to person, time and place. His memory and abstract reasoning appeared good. His judgment was considered intact concerning social norms and family, but impaired concerning finances, employment and future plans. Hock was apparently able to recognize that he was ill and in need of help and was aware that he himself was the source of many of his problems.

At Walter Reed Hock was placed on Thorazine to relieve his agitation. His dosage of Thorazine was ultimately increased to 1600 mg. per day. Although during the early part of his hospitalization, Hock complained bitterly about being hospitalized and particularly about the side effects associated with taking the Thorazine (*i.e.*, nasal congestion, occasional abdominal cramps and somnolence), Hock eventually acknowledged that he felt less anxious and indicated his surprise at his lack of desire for alcohol. Hock noted that the Thorazine seemed to be an effective substitute for alcohol. Hock also apparently experienced no auditory or visual hallucinations while in the hospital. While at Walter Reed, Hock enrolled in an Alcoholics Anonymous program and seemed to respond favorably, though he was full of anxiety about his return to civilian life and demonstrated poor insight as to realistic goals and means of obtaining them.

A Medical Board at Walter Reed concluded that Hock was unfit for further military duty, but that because Hock had not received the maximum benefit from his hospitalization at Walter Reed, he should not be, even though he was mentally competent and able to manage his own financial affairs, discharged to his own care. The Board accordingly recommended that Hock be transferred to a VA hospital near his home for further treatment.

Hock was subsequently voluntarily transferred to the VA Hospital in Lebanon, Pennsylvania, near his home, on March 23, 1976, and was discharged from that hospital on April 2, 1976. Dr. Trevor J. Pearman, a doctor on the staff at the Lebanon facility, described Hock's stay at the hospital as uneventful and Hock himself as cooperative and alert and as a patient who took his medicine without any difficulty. Hock apparently mixed well with others and managed his privileges satisfactorily. Hock seemingly was not anxious or suffering from paranoia. Hock wanted to be discharged in order to return to his family and appeared in good contact with reality. Hock asked that arrangements be made for him to see a vocational counselor for job placement and indicated that he contemplated taking a Civil Service Examination as well. Hock expressed a strong dislike of hospitalization, but did not seem hostile,

aggressive, suicidal or homicidal to the doctors at the Lebanon VA Hospital.

At the Lebanon VA Hospital, Hock was seen by an alcoholism rehabilitation counselor, who commented that Hock seemed fully aware of his drinking problem. Hock became involved with the Alcoholism Group during his stay at the Lebanon VA Hospital and stated that he planned to continue to attend Alcoholic's Anonymous meetings after his discharge in order to stay sober. Hock apparently did not have a drink of alcohol during the entire time he was hospitalized at Walter Reed and at Lebanon.

Upon Hock's discharge, the doctors at Lebanon and he agreed that he would visit the VA Outpatient Clinic in Harrisburg, Pennsylvania, in one month for review. In addition, Hock was given a one-month's supply of Thorazine 250 mg. to take four times a day as medication. On April 29, 1976, Hock was involuntarily retired from the Army and placed on the temporary disability retirement list.

As a result of some unexplained foul-up, Hock did not attend the VA Outpatient Clinic in Harrisburg until August 9, 1976, considerably more than one month following his discharge from the Lebanon VA Hospital. At the Harrisburg VA Outpatient Clinic, Hock was examined for approximately 1½ hours by Dr. Jacob H. Garber, a psychiatrist. Prior to Hock's outpatient visit, Garber reviewed Hock's past medical records from Walter Reed and Lebanon. Garber's report of his August 9, 1976, examination indicates that Hock was unemployed from his discharge from Lebanon until August 9, 1976, but that on August 5, 1976, Hock had taken a civil service examination to become a junior federal assistant and that Hock hoped to become employed in that capacity.[1] Garber reported that Hock was neatly dressed, appeared his stated age of 29 years and chain-smoked throughout the session. Garber indicated that Hock's speech was understandable, well-organized and spontaneous. Hock related to Garber that Hock's four-year-old son had been struck by an automobile and killed on June

24, 1976. Hock blamed himself for his son's death because the boy had been in Hock's care at the time of the accident. Hock indicated that he had become increasingly depressed over his son's death and that, although he had been "off the drink" prior to his son's death, he had started drinking thereafter to calm his nerves. Hock stated that once while he was drinking he forgot that his son was dead and went looking for him and that another time he thought that he had hurt someone with a knife. However, Garber observed that Hock was not intoxicated at the time of the examination, that there was no smell of alcohol on his breath, and that Hock was coherent and well-coordinated. Accordingly, Garber concluded that Hock had not returned to heavy drinking and that his condition did not present a crisis situation requiring immediate hospitalization or immediate psychiatric intervention. At trial, Garber testified that on August 9, 1976, he had thought that as of that date Hock could competently drive an automobile despite his drinking problem.

Garber reported that Hock told him that he had not taken the Thorazine that had been given to him upon his discharge from Lebanon. Hock seemed depressed, as well as sad and apprehensive because of his son's death, but was well-oriented and denied having hallucinations or delusions. Hock was attentive but his thoughts sometimes wandered. Hock again indicated that although he had always felt suicidal he would not kill himself because of his firm belief in reincarnation. Garber noted that Hock seemed intelligent and in a much better condition than that reflected in his past medical records. Garber also commented that several times during the session Hock expressed hostility towards the idea of hospitalization.

On the basis of the August 9, 1976, examination, Garber diagnosed Hock as a paranoid schizophrenic in partial remission. In Garber's judgment, Hock was not actively psychotic and was competent and employable. Garber further concluded that Hock

---

1. Hock achieved a passing score of 76.7% (70% was passing) on that examination.

did not appear homicidal or suicidal. Garber gave Hock a prescription for Mellaril, an antidepressant, 50 mg., and told Hock to return to the clinic in one month for further evaluation of his medication and mental status. Hock was subsequently given an appointment to return on September 13, 1976.

Garber stated that he changed Hock's medicine from Thorazine 250 mg. four times a day to Mellaril 50 mg. because at the time Hock was not actively psychotic but was depressed over his son's death. Thorazine is an effective medication for schizophrenia, but may have unpleasant side effects including depression. Mellaril is considered an antidepressant which is effective in the treatment of schizophrenia and has fewer unpleasant side effects than Thorazine. Garber further noted that Hock had not taken the Thorazine that had been given to him upon his discharge from Lebanon. Garber feared that Hock would again experience bad side effects if given Thorazine. In that connection Garber considered the fact that in his experience 50% of his patients did not take their medication. Accordingly, Garber changed medication in the hope that Hock would take the Mellaril.

As part of the Harrisburg VA Outpatient Clinic's team treatment approach, Joseph G. A. Holden, a psychiatric social worker, interviewed Mrs. Joan Hock while her husband was being examined by Garber. It was standard operating procedure for Holden to relate to Garber any information, gleaned from such an interview with a patient's spouse, which suggested that the patient is a homicidal or suicidal risk. During Holden's interview with Mrs. Hock, she did not relate any information suggesting that her husband was a homicidal or suicidal threat at that time. Accordingly, Holden had no information to convey to Garber in accordance with that standard operating procedure. In addition, Mrs. Hock at no time indicated to Holden that her husband was seriously drinking again.

It was also standard operating procedure for Holden to advise a spouse such as Mrs. Hock that, if the patient's condition worsened, either to contact a crisis center in the community, or to call the clinic, or to have the patient hospitalized if necessary. Holden believes that he followed that procedure during his talk with Mrs. Hock. Holden assessed whether Mrs. Hock could be relied upon to take the initiative to seek out help for her husband if necessary. Although Holden felt that Mrs. Hock was suffering much guilt feeling as a result of her son's death, Holden also believed that she seemed to be coping with that tragedy as well as with the stress of her marriage. Accordingly, he concluded that she could be relied upon to come forward and to seek help if a crisis developed with regard to her husband. Mrs. Hock specifically told Holden that she had accompanied her husband to the clinic to be sure that her husband would seek treatment and that he would tell the doctors everything. Holden advised Mrs. Hock of agencies she could turn to for help and encouraged her to return to see him at the same time that her husband returned to see Garber. Although Holden indicated that he believed that without some relief from her feelings of guilt over her son's death, Mrs. Hock might require hospitalization, he believed that her talking to him had been helpful and that his assurance that her husband would improve was also of therapeutic value to Mrs. Hock.

On September 9, 1976, Mrs. Hock telephoned the Harrisburg VA Outpatient Clinic to report that her husband had been killed in an automobile accident on August 21, 1976.

Plaintiffs attack Hock's treatment by Garber at the Harrisburg VA Outpatient Clinic.[2] Plaintiffs allege that such treatment was negligent or grossly negligent in the following respects: (1) Garber did not seek to persuade Hock to hospitalize himself voluntarily on August 9, 1976; (2) Garber did not seek to commit Hock involuntarily

---

2. Plaintiffs have not contended that Hock's treatment at either Walter Reed or the Lebanon Hospital was negligent.

on August 9, 1976; (3) Garber should not have changed Hock's prescription from Thorazine to Mellaril; (4) the arrangement for a follow-up appointment a month later was inadequate; and (5) Garber's and Holden's reliance upon Mrs. Hock to come forward for help if her husband's condition should worsen was misplaced. In addition, plaintiffs claim that Garber should have reported Hock's condition to the Pennsylvania DMV pursuant to the provisions of 75 Pa. Stat. § 1226.

Defendant asserts several defenses. First, defendant denies that the actions of Garber or Holden were negligent. Second, defendant asserts that the United States owed no duty in tort to plaintiffs. Third, defendant contends that as of August 9, 1976, Hock could not have been involuntarily committed under Pennsylvania law. Fourth, defendant takes the position that the applicable Pennsylvania law affords defendant a qualified immunity for the psychiatric treatment rendered to Hock in that the law imposes upon plaintiffs the burden of showing gross negligence or incompetence in the treatment of Hock, a burden which, defendant says, plaintiffs have not met. Fifth, defendant claims that the automobile accident which occurred on August 21, 1976, was not proximately caused by the medical treatment received by Hock on August 9, 1976. Finally, defendant argues that the Pennsylvania statute that requires doctors to report certain medical information to the Pennsylvania DMV is inconsistent with the confidentiality provisions of federal law and regulations and with the VA practice with regard to patient records.

*Subject-Matter Jurisdiction and Applicable Law*

■ 28 U.S.C. § 1346(b) provides in pertinent part:

> [T]he district courts shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

That subject-matter jurisdictional provision is also a choice-of-law provision which directs the district court to apply "the law of the place where the act or omission occurred." In this case, Hock was treated in Pennsylvania and the automobile accident occurred in Pennsylvania. Accordingly, the applicable law is the law of the Commonwealth of Pennsylvania. *Toole v. United States,* 588 F.2d 403, 406 (3d Cir. 1978); *Leedy v. Hartnett,* 510 F.Supp. 1125, 1127 (M.D.Pa.1981).[3]

*Defendant's Duty in Tort*

Defendant contends that under Pennsylvania law the United States owed no duty in tort to protect plaintiffs or the general public from any danger allegedly posed by Hock.[4] In support of that contention de-

---

**3.** 28 U.S.C. § 2675 provides that "[a]n action shall not be instituted upon a claim against the United States for money damages for ... personal injury ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency ...." In addition, 28 U.S.C. § 2401(b) states:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the

claim by the agency to which it was presented.

In the within case, the accident in question occurred on August 21, 1976, and plaintiffs submitted their administrative claim on November 9, 1977. That claim was denied in a letter mailed on March 5, 1980, and the within action was instituted on September 3, 1980. Accordingly, plaintiffs have complied with the administrative exhaustion requirement of 28 U.S.C. § 2675. In addition, this action was timely filed under 28 U.S.C. § 2401.

**4.** It is plain that merely intoning the word duty has no special significance.

fendant relies upon the recent decision of the United States District Court for the Middle District of Pennsylvania in *Leedy v. Hartnett*, 510 F.Supp. 1125 (M.D.Pa.1981).[5]

In many respects, the facts assumed in *Leedy* for purposes of summary judgment are not too dissimilar from the facts found in the within case. In *Leedy*, plaintiffs, husband and wife, claimed that the Lebanon VA Hospital was negligent in failing to warn them of the alleged violent tendencies of a veteran, Hartnett, who had been released from that hospital and who had come to live in the plaintiffs' home. Hartnett had been hospitalized on more than 20 occasions for treatment for paranoid schizophrenia and chronic alcoholism. Although previously Hartnett had been involuntarily committed, he had been a voluntary patient at the Lebanon VA Hospital immediately prior to the assaults complained of in *Leedy*. While hospitalized there in 1974, Hartnett met Leedy in Leedy's capacity as a service officer of the local Veterans of Foreign Wars. Their relationship was known to hospital personnel. Also, during the course of Hartnett's treatment at the hospital, its personnel knew of a history of violent outbursts by Hartnett caused to a great extent by his alcoholism and by his drinking in spite of that condition.

On March 21, 1978, Hartnett left the hospital. On March 29, 1978, he moved into the Leedy residence at Leedy's invitation. Seemingly, hospital personnel knew he would live at least temporarily with the Leedys. During the early morning hours of April 1, 1978, after consuming a substantial quantity of beer and taking some Thorazine, Hartnett allegedly beat the Leedys while they slept.

Plaintiffs' theory of liability was that because the hospital stood in a psychiatrist-patient relationship with Hartnett, the hospital owed plaintiffs a duty to warn them of Hartnett's alleged violent tendencies and that the breach of that duty was a substantial cause of the assault and of their injuries. Indicating that the question presented by plaintiffs' theory of liability appeared to be one of first impression in Pennsylvania, but one that had been adopted to a certain extent by other courts, 510 F.Supp. at 1127–28, the Court, after distinguishing the cases adopting that theory of liability, held that Pennsylvania law did not impose liability upon defendants upon the facts of that case.

In *Leedy*, the Court discussed the leading case holding that the psychiatrist-patient relationship imposes affirmative duties upon the psychiatrist for the benefit of others, namely, *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) (en banc). In that case, Tatiana Tarasoff had been killed by a young man who had two months earlier confided to a psychologist employed by a hospital at the University of California that he intended to kill Tatiana. The psychologist had reported the incident to the campus police, who had briefly detained the patient, but who had then released him when he seemed to be rational and prom-

---

The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. It is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say the particular plaintiff is entitled to protection.

There is little analysis of the problem of duty in the courts. Frequently it is dealt with in terms of what is called "proximate cause," usually with resulting confusion. In such cases, the question of what is "proximate" and that of duty are fundamentally the same: whether the interests of the plaintiff are to be protected against the particular invasion by the defendant's conduct.

W. Prosser, *Law of Torts* 325–26 (4th ed. 1971) (footnotes omitted).

5. Interestingly, all of the relevant events in the within case occurred in the Middle District of Pennsylvania.

ised to stay away from Tatiana. Thereafter, the psychologist's superior directed that no further action be taken to confine or otherwise restrain the patient. No one warned either the victim or her parents of the danger presented by the patient. Upon those facts, Justice Tobriner wrote:

> [D]efendant therapists cannot escape liability merely because Tatiana herself was not their patient. When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

*Id.* 131 Cal.Rptr. at 20, 551 P.2d at 340. The Court (at 343) relied upon Restatement (Second) of Torts § 315 [6] [hereinafter cited as *Restatement*] in holding that the special relation which exists between a patient and his doctor or psychotherapist "may support affirmative duties for the benefit of third persons. Thus, for example, a hospital must exercise reasonable care to control the behavior of a patient which may endanger other persons." 131 Cal.Rptr. at 23, 551 P.2d at 343 (footnote omitted).[7]

In *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980) (en banc), the Supreme Court of California seemingly limited the scope of the *Tarasoff* holding. In *Thompson* plaintiffs' son was killed by a juvenile offender recently released from confinement by defendant. Defendant knew that the juvenile had " 'latent, extremely dangerous and violent propensities regarding young children and that sexual assaults upon young children and violence connected therewith were a likely result of releasing him into the community,' " (167 Cal.Rptr. at 72, 614 P.2d at 730) and that the juvenile "had 'indicated that he would, if released, take the life of a young child residing in the neighborhood.' " *Id.* The juvenile did not, however, indicate which young child was his intended victim. The defendant released the juvenile "on temporary leave into his mother's custody," *id.*, but did not warn his mother, the local police or parents of young children in the vicinity. Within 24 hours of his release, the juvenile killed plaintiffs' son.

The Court held that, as a matter of law, the defendant owed no duty to warn the neighborhood parents. The Court distinguished *Tarasoff* on the ground that the decedent therein "was the known and specifically foreseeable and identifiable victim of the patient's threats." *Id.* 167 Cal.Rptr. at 76, 614 P.2d at 734. Accordingly, the Court held that "the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim." *Id.* 167 Cal.Rptr. at 80, 614 P.2d at

---

**6.** Restatement (Second) of Torts § 315 [hereinafter cited as *Restatement*] provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

In the within case, the "actor" identified in § 315 is the United States as defendant, including those doctors employed by it, the "third person" is Hock and the "others" are the Haseneis. No special relationship existed between

defendant and the Haseneis. Accordingly, if defendant's duty is to be predicated upon *Restatement* § 315, then such a duty must rest upon a special relationship existing between defendant and Hock within the meaning of § 315(a).

**7.** *See also McIntosh v. Milano*, 168 N.J.Super. 466, 403 A.2d 500 (1979), in which the Superior Court of New Jersey, relying heavily on *Tarasoff*, denied a psychiatrist's motion for summary judgment on facts very similar to those in *Tarasoff*, i.e., "it was clear to the psychiatrist that his patient posed a particular threat to the decedent." *Leedy v. Hartnett*, 510 F.Supp. at 1129. *See McIntosh v. Milano*, 403 A.2d at 511–12.

738. On that basis, the Court concluded "that public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims.*" *Id.* 167 Cal.Rptr. at 77, 614 P.2d at 735 (emphasis in original). The Court stated, however, that when "the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims who can be effectively warned of the danger, a releasing agent may well be liable for failure to warn such persons." *Id.* 167 Cal.Rptr. at 80, 614 P.2d at 738.

The District Court, in *Leedy*, discussing *Tarasoff* and *Thompson*, concluded:

> On the facts of this case, ... [the veteran] did not pose any danger to the Leedys different from the danger he posed to anyone with whom he might be in contact when he became violent. This is not a case in which it is alleged that the propensity to violence is increased by frequent contacts with the same people; rather, Plaintiffs' claim that they represent a readily identifiable group rests solely on a statistical probability that the more one saw [the veteran] the more likely it is that one would be a victim of any violent outbreak by him. This is not the type of readily identifiable victim or group of victims to which the California Supreme Court made reference in *Tarasoff* or *Thompson*.

510 F.Supp. at 1130. Accordingly, as stated *supra*, the District Court held that the hospital had no duty to warn the Leedys.

In *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb.1980), a patient who had previously been committed to a mental institution and who had been receiving psychiatric care from the VA, but who quit such treatment against the advice of his doctors, purchased a shotgun, entered a night club and fired the shotgun into a crowded dining room, wounding plaintiff and killing her husband. Judge Denney, applying what he believed to be Nebraska law, denied summary judgment to the United States and held that there had been stated against the United States a good cause of action for negligence, *i.e.*, because the VA "knew or should have known that [the patient] was dangerous to himself and others and because the V.A., despite this knowledge, failed 'to take those steps ... customarily taken ... for the care and treatment of mentally ill and dangerous persons by mental health professionals practicing in the community.'" *Id.* at 187. Relying on *Tarasoff* and one of its progeny, *McIntosh v. Milano*, 168 N.J.Super. 466, 403 A.2d 500 (1979), *see* note 7 *supra*, the District Court held in *Lipari* that the Supreme Court of Nebraska "would find that the therapist-patient relationship gives rise to an affirmative duty for the benefit of third persons." 497 F.Supp. at 191. Judge Denney, reading *Tarasoff* as supporting more than the duty to warn and concluding that "the language of the case makes clear that the nature of the precautions which must be taken depends on the circumstances," *id.* at 193, reasoned:

> It is not unfair to require the psychotherapist to take those precautions which would be taken by a reasonable therapist under similar circumstances. Moreover, this Court refuses to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings, or that there is never a duty to attempt to detain a patient. These issues can only be determined after the parties have had an opportunity to prove what precautions a reasonable psychotherapist would take under the circumstances in issue here.

Judge Denney went on to limit the scope of the therapist's "affirmative duty for the benefit of third persons," *id.* at 191, by reference to foreseeability, stating that the therapist would only be liable if he "could have reasonably foreseen an unreasonable risk of harm to [plaintiffs] or a class of persons of which the [plaintiffs] were members." *Id.* at 195.[8]

---

8. In *Leedy* the court declined to follow the reasoning of *Lipari* "[b]ecause the case appears to impose a duty on a hospital to protect the public at large." 510 F.Supp. at 1129.

■ None of the cases known to this Court which have recognized that the psychiatrist-patient relationship may impose affirmative duties upon the psychiatrist for the benefit of third persons appear to have indicated what it is about that relationship as such that brings it within the rule of *Restatement* § 315. *Restatement* § 315 is "a special application of the general rule stated in § 314" that there is no duty to act for the protection of others. *Restatement* § 315 Comment a. Section 315 thus first states the general rule that an actor has "no duty so to control the conduct of a third person as to prevent him from causing physical harm to another." There is, however, an exception to this general rule whenever "a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Implicit in that exception, however, is the proposition that such a special relationship must include the right or the ability to control another's conduct. *Restatement* §§ 316–319 lists the relationships which require the actor to control the third person's conduct.[9] *Restatement* § 315 Comment c. In all of those relationships,[10] the actor has either the right or the ability to control the third person's conduct. Thus, in the absence of a relationship involving such control, the exception to the general rule, that there is no duty to control the conduct of a third person for the protection of others, should not be applicable.[11] An examination of the relationship which existed between Garber and Hock on August 9, 1976, indicates that Garber had neither the right nor the ability to control Hock's conduct. In fact, the typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of § 315.[12] Indeed, lack of control by the therapist and maximum freedom for the patient is oft times the end sought by

**9.** *See also* Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale L.J. 886 (1934); F. Harper & F. James, Law of Torts 1053–58 (1956); W. Prosser, Law of Torts 348–50 (4th ed. 1971).

**10.** Section 316 relates to parents and children, section 317 to masters and servants, section 318 to possessors of land or chattels and licensees, and section 319 to persons having charge of another person having dangerous propensities. Comment a to section 319 twice uses the word "charge." The words "ability to control" and similar words appear throughout the comments to all four sections. The following illustrations are given as to section 319:

 1. A operates a private hospital for contagious diseases. Through the negligence of the medical staff, B, who is suffering from scarlet fever, is permitted to leave the hospital with the assurance that he is entirely recovered, although his disease is still in an infectious stage. Through the negligence of a guard employed by A, C, a delirious smallpox patient, is permitted to escape. B and C communicate the scarlet fever and smallpox to D and E respectively. A is subject to liability to D and E.

 2. A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C.

**11.** This analysis is consistent with prior cases imposing liability upon psychiatrists for injuries caused by their patients to others. In many of these cases, the relationship between the psychiatrist and the patient involved an element of control. *See, e.g., Semler v. Psychiatric Institute of Washington, D. C.*, 538 F.2d 121, 125 (4th Cir.) (Butzner, J.) (psychiatrists breached duty imposed by court order of probation to protect public by retaining custody over probationer until released by court order) (relying upon and discussing Restatement § 319), *cert. denied*, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976); *Hicks v. United States*, 511 F.2d 407 (D.C.Cir.1975) (Fahy, J.) (patient committed pursuant to court order); *Underwood v. United States*, 356 F.2d 92 (5th Cir. 1966) (patient in active military service); *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956) (same); *Merchants Nat'l Bank & Trust Co. v. United States*, 272 F.Supp. 409 (D.N.D.1967) (patient was committed to VA hospital as mentally ill).

**12.** "Once the suggestion of control is eliminated, there is nothing in the nature of the relationship between a psychiatrist and his patient to support an exception to the tort law presumption." Stone, *The Tarasoff Decisions: Suing Psychotherapists to Safeguard Society*, 90 Harv.L.Rev. 358, 366 (1976).

both the psychiatric profession and the law.[13]

■ Plaintiffs suggest that Garber should have sought to commit Hock involuntarily on August 9, 1976. However, even plaintiffs' expert agreed at trial that Hock could not have been involuntarily committed under the standards prevailing in Pennsylvania as of August 9, 1976. To have been involuntarily committed as of that date, Hock must have been "severely mentally disabled and in need of immediate treatment" and have "pose[d] a clear and present danger of harm to others or to himself." *Goldy v. Beal*, 429 F.Supp. 640, 650 (M.D.Pa.1976).[14] Under the then applicable standards for determining such "clear and present danger,"[15] Garber, as a matter of law, could not have involuntarily committed Hock on August 9, 1976.

■ Plaintiffs also contend that Garber should have sought to persuade Hock voluntarily to hospitalize himself. However, in that regard, it is undisputed that several times during Hock's examination by Garber, Hock expressed severe hostility toward the idea of hospitalization. Thus, it is most unlikely that Garber could have persuaded Hock voluntarily to enter a hospital. Even if Garber had so persuaded Hock, Hock would not have remained in the hospital indefinitely. Furthermore, Garber made the clinical judgment that Hock did not need hospitalization. That judgment is accepted by this Court as competent.[16]

■ Plaintiffs further assert that Garber should not have changed Hock's prescription from Thorazine to Mellaril since Thorazine had been a successful medication in the past. However, even if Garber had prescribed Thorazine again, he could not have made Hock take it.[17] Indeed, Hock had been given a month's supply of Thorazine upon his discharge from the Lebanon VA Hospital on April 2, 1976, but had not taken

**13.** *See, e.g., O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

**14.** The current standards governing involuntary commitment in Pennsylvania are set forth in 50 Pa.Stat.Ann. § 7301. That statute did not become effective until September 8, 1976. The same standards were nevertheless apparently in effect on August 9, 1976, as a result of a stay order entered in *Goldy v. Beal*, 429 F.Supp. 640, 649–50 (M.D.Pa.1976). On July 8, 1976, the Court in *Goldy* had declared the prior Pennsylvania involuntary commitment statute unconstitutional. The Pennsylvania Legislature responded promptly by passing the current statute on July 9, 1976, effective 60 days thereafter. On July 19, 1976, the District Court entered a stay order setting forth the standards for involuntary commitment which would govern until the effective date of the new statute. Those standards, *see* note 15 *infra*, were substantially the same as the present 50 Pa.Stat.Ann. § 7301.

**15.** *See Goldy v. Beal*, 429 F.Supp. at 650:
Determination of Clear and Present Danger. (1) Clear and present danger shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated.

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under the act; or (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act; or
(iii) the person has severely mutilated himself or attempted to mutilate himself severely and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act.
Subsequent Pennsylvania cases have indicated that the standards for determining clear and present danger are high. *See, e.g., In re S. C.*, 280 Pa.Super. 539, 421 A.2d 853 (1980); *In re Jerry Green*, 273 Pa.Super. 397, 417 A.2d 708 (1980). There is nothing in the record in the within case to show that Hock presented any such threat of harm to others or to himself within the 30 days prior to August 9, 1976.

**16.** *See* pages 1018–1019 *infra*.

**17.** Garber testified that in his experience approximately half of his patients do not take their medication.

it. Garber thus prescribed Mellaril, which has fewer unpleasant side effects than Thorazine, in the hope that Hock would take the Mellaril.[18]

Finally, plaintiffs argue that Garber failed to take any steps to prevent Hock from driving. Assuming *arguendo* that Garber had determined that Hock was potentially dangerous as a driver (in fact, to the contrary, Garber thought that Hock could competently drive an automobile), there is nothing Garber could have done to prevent Hock from driving.[19] Hock could not have been involuntarily committed. Taking Hock's keys away from him or encouraging his wife to take his keys away might not have prevented Hock from getting another set of keys or gaining access to another car. Furthermore, even if Garber could have reported Hock to the Pennsylvania DMV, *see* pages 1013–1016 *infra*, and the DMV had revoked Hock's license,[20] Hock might still have driven an automobile.

If Hock was apparently willing to drive while intoxicated on the wrong side of the road with his headlights off, it is not too unlikely that he also would have been willing to drive without a license.

Plaintiffs basically allege that Garber was negligent in failing to predict Hock's dangerousness to others and that, consequently, Garber failed in his alleged duty to protect others adequately against that dangerousness. However, there seemingly was no way in which Garber could have predicted with any reasonable degree of medical or psychiatric certainty that within 12 days or one month Hock would do harm to himself or to others. Defendant's expert witness, Dr. Robert L. Sadoff, so testified convincingly in this case. The near-impossibility of accurately or reliably predicting dangerousness has been well-documented.[21]

In sum, the relationship which existed between Garber and Hock as of August 9,

**18.** If a physician prescribes medication for a patient and fails properly to warn the patient of the adverse side effects of such medication, the physician may be liable to third persons foreseeably injured by his failure so to warn. *See Kaiser v. Suburban Transportation System*, 65 Wash.2d 461, 398 P.2d 14 (1965), in which the Supreme Court of Washington held that a jury could find a doctor liable for failing to warn a patient whom the doctor knew to be a bus driver that a drug prescribed by the doctor might cause loss of consciousness. In *Kaiser* the plaintiff was a passenger who was injured when the doctor's patient blacked out and the bus struck a telephone pole.

**19.** *See Harland v. State*, 142 Cal.Rptr. 201 (Ct. App.1977). In *Harland*, plaintiffs sued the State of California for wrongful deaths and injuries suffered when their truck was involved in an automobile accident with another vehicle driven by one Edgmon, a resident of the California Veterans Home. Although concluding that a special relationship existed between the State and Edgmon, Justice Christian held that the State of California had no duty to prevent Edgmon from driving a car, even though there was evidence that employees of the Veterans Home had reason to know that Edgmon's driving presented a risk of harm to himself and to others and even though there was uncontradicted evidence that a physician had warned Edgmon that he should not drive when under medication. However, since no lawful basis, short of an adjudication of incompetency, was shown for preventing Edgmon from driving, the Court held that the State could not be held liable on the theory that it had failed to prevent Edgmon from driving. The concurring opinion, however, argued that "the relationship was, such that the authorities exercised an all-pervasive degree of control over Edgmon's conduct," and that such control imposed a duty on the State to protect foreseeable victims from Edgmon's conduct. 142 Cal.Rptr. at 210.

**20.** In any event, however, it seems improbable that the DMV would have revoked Hock's license within 12 days.

**21.** *See, e.g.,* Diamond, *The Psychiatric Prediction of Dangerousness*, 123 U.Pa.L.Rev. 439 (1974); Ennis & Litwack, *Psychiatry & the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Calif.L.Rev. 693 (1974); Stone, note 12 *supra*. Indeed, it has been suggested that the most accurate prediction a psychiatrist can make is that a person will *not* become violent. Ennis & Litwick, *supra*, at 715. *See Tarasoff v. Regents of the University of California*, 131 Cal.Rptr. at 34, 551 P.2d at 354 (Mosk, J., concurring and dissenting):

I cannot concur, however, in the majority's rule that a therapist may be held liable for failing to predict his patient's tendency to violence if other practitioners, pursuant to the "standards of the profession," would have done so. The question is, what standards? Defendants and a responsible amicus curiae, supported by an impressive body of literature ... demonstrate that psychiatric predictions of violence are inherently unreliable.

1976, did not give Garber the right or the ability to control Hock's conduct.[22] In the absence of such a relationship, Garber owed no duty to plaintiffs to control Hock's conduct,[23] particularly since his own assessment, deemed competent by this Court as indicated *infra*, carried with it a lack of prediction of any identifiable danger posed by Hock to any person.[24]

Justice Mosk suggested that if *in fact* a psychiatrist predicts violence, then a duty to warn may arise. *Id.* In the within case, Garber did not in fact diagnose Hock as presenting any danger of harm to himself or to others.

**22.** Since such control was lacking, the problem perhaps also should be approached in terms of proximate cause—*i.e.*, if a defendant lacks the ability to control a third person's conduct, his failure so to control cannot be said to have been the proximate cause of the plaintiff's injuries. As Prosser has indicated, the concepts of duty and proximate cause are closely intertwined.

It is quite possible, and often helpful, to state every question which arises in connection with "proximate cause" in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur? Such a form of statement does not, of course, provide any answer to the question, or solve anything whatsoever; but it does serve to direct attention to the policy issues which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact. The question becomes particularly helpful in cases where the only issue is in reality one of whether the defendant is under any duty to the plaintiff at all—which is to say, whether he stands in any such relation to the plaintiff as to create any legally recognized obligation of conduct for his benefit. Or, reverting again to the starting point, whether the interests of the plaintiff are entitled to legal protection at the defendant's hands against the invasion which has in fact occurred. Or, again reverting, whether the conduct is the "proximate cause" of the result. The circumlocution is unavoidable, since all of these questions are, in reality, one and the same.

W. Prosser, *Law of Torts* at 244–45 (4th ed. 1971) (footnotes omitted).

**23.** It may be that in certain circumstances a doctor is under a duty to *establish* control. For example, in *Greenberg v. Barbour*, 322 F.Supp. 745 (E.D.Pa.1971), Judge Lord held that plaintiff could withstand a motion for summary judgment in an action claiming damages for injuries suffered when plaintiff was assaulted by one Hall who had sought medical aid at a hospital, but had not been given assistance. There was evidence that although the hospital's clinical director had been informed that Hall was dangerous, homicidal and suicidal, the doctor on duty failed to admit him. The court held that "[p]laintiff's proofs have sufficiently indicated that [the clinical director] may have been guilty of negligence in that he, having been informed of Hall's dangerous and homicidal state, did not adequately convey to [the doctor on duty] the extent of the danger. Conversely, [the doctor on duty] may also be guilty of negligence if he, having been fully warned of Hall's dangerous condition, did not act within a reasonable time to consummate Hall's admittance." *Id.* at 747–48. However, in the within case, as stated *supra* in the body of this opinion, Hock could not have been involuntarily committed and was not seeking hospitalization. Furthermore, Garber made an informed clinical judgment that Hock was not in any immediate need of hospitalization, a judgment which this Court, as discussed *infra* in the body of this opinion, accepts as competent.

**24.** If a psychiatrist in fact predicts a specific danger to a specific or readily identifiable person or group of persons, a different conclusion may be required. In such a situation a psychiatrist should take reasonable action to prevent any harm to such victims.

Tort case law provides no justification for finding in the therapist-patient relationship for making an exception to the general rule that a person has no duty to protect third persons. However, I see no reason not to impose a legal duty where a moral duty is clear and the action it requires is readily comprehensible to those who have the duty. . . .

If . . . the therapist believes that he has *overcome* the problem of prediction and decided that his patient is dangerous and that the public and patient need protection, he does have a clear moral duty which allows a legal duty to be imposed. Imposing liability only at the point at which the therapist has formed his judgment, rather than under some indeterminate malpractice standard dependent on the "ordinary exercise" of a nonexistent skill, will avoid the obvious tendency toward the overprediction of dangerousness. . . .

Making the legal duty dependent on the therapist's subjective determination of the patient's dangerousness would of course severely limit the number of instances in which suit could successfully be brought. In the usual case, once the therapist has convinced himself that a patient is certainly dangerous, he will take some action. Only where he has

*Defendant's Duty to Report*

Plaintiffs assert that Pennsylvania law imposed a duty upon defendant to report to the DMV that Hock could not safely operate a motor vehicle. The Act of April 29, 1959, Pub.L.No.58, § 1226 (codified as 75 Pa.Stat. § 1226), which seemingly was in effect at the time in question, provided:

> The person in charge of every mental hospital, mental institution or mental clinic, shall make a report to the secretary, of the admission of every person who, upon examination therefor, is found to be suffering from a mental disability which, in the opinion of the examining physician, would prevent such person from exercising reasonable and ordinary control over a motor vehicle or tractor, and at the completion of treatment or upon discharge, shall inform the secretary as to such person's ability or inability to exercise reasonable and ordinary control over a motor vehicle.[25]

Assuming *arguendo* only that the broad language of § 1226—*i.e.*, "every mental hospital, mental institution or mental clinic"—would render the duty to report thereunder applicable to either the Lebanon VA Hospital or the VA Outpatient Clinic at Harrisburg or both, nevertheless, for the reasons stated *infra*, federal confidentiality provisions, as well as prevailing VA prac-tice, apparently would have prevented any such disclosure about Hock by Garber.

With regard to VA records, 38 U.S.C. § 3301(a) provides:

> All files, records, reports, and other papers and documents pertaining to any claim under any of the laws administered by the Veterans' Administration and the names and addresses of present or former personnel of the armed services, and their dependents, in the possession of the Veterans' Administration shall be confidential and privileged, and no disclosure thereof shall be made except as provided in this section.

That paragraph has remained substantially unchanged since 1972 when the reference to names and addresses of present and former members of the armed services was added by Pub.L.No.92–540. That 1972 amendment also added the following exception to the confidentiality requirement:

> The Administrator may, pursuant to regulations he shall prescribe, release the names and addresses of present or former personnel of the armed services, and/or dependents to any nonprofit organization but only if the release is directly connected with the conduct of programs and the utilization of benefits under this title.

Prior to the enactment of that amendment, the VA had cooperated with local health

---

reached this conclusion—and made it clear in records or consultation—and then failed to act would liability be imposed....
Stone, note 12 *supra*, at 375–76.

**25.** This provision was superseded by 75 Pa. Cons.Stat.Ann. § 1518, which became effective July 1, 1977:

(a) Definition of disorders and disabilities. —The Medical Advisory Board shall define disorders characterized by lapses of consciousness or other mental or physical disabilities affecting the ability of a person to drive safely for the purpose of the reports required by this section.

(b) Reports by medical personnel.—All physicians and other persons authorized to diagnose or treat disorders and disabilities defined by the Medical Advisory Board shall report to the department, in writing, the full name, date of birth and address of every person over 15 years of age diagnosed as having any specified disorder or disability within ten days.

(c) Responsibility of institution heads.— The person in charge of every mental hospital, institution or clinic, or any alcohol or drug treatment facility, shall be responsible to assure that reports are filed in accordance with subsection (b).

(d) Confidentiality of reports.—The reports required by this section shall be confidential and shall be used solely for the purpose of determining the qualifications of any person to drive a motor vehicle on the highways of this Commonwealth.

(e) Use of report as evidence.—No report forwarded under the provisions of this section shall be used as evidence in any civil or criminal trial except in any proceeding under section 1519(c) (relating to determination of incompetency).

(f) Immunity from civil and criminal liability.—No civil or criminal action may be brought against any person or agency for providing the information required under this system.

and safety organizations by complying with state laws relating to disclosure by medical personnel about communicable diseases, gunshot wounds and diseases which might affect one's ability to operate a motor vehicle. *See, e.g., Fitch v. Veterans Administration,* 597 F.2d 1152, 1154 (8th Cir. 1979). In 1974, the VA General Counsel was asked for an opinion as to whether the 1972 amendments to 38 U.S.C. § 3301 removed the Administrator's pre-1972 discretion to continue to release such information.[26] In a published decision, Op.G.C. 13–74, the General Counsel construed subsection (9) of 38 U.S.C. § 3301 as added by Pub.L.No.92–540 as preventing the VA from disclosing the names and addresses of veterans to local health and safety organizations other than in accord with the exception stated in that statute. Thus, at the time of Hock's admission and discharge from the Lebanon VA Hospital, it was the legal opinion of the General Counsel of the VA that the Administrator had no discretion to release the names and addresses of present and former

servicemen to an agency such as the DMV since, while such an agency would constitute a "nonprofit organization" within the meaning of 38 U.S.C. § 3301(9), such release would not be directly connected with the conduct of programs or utilization of benefits under Title 38 of the United States Code. That opinion would appear to have been correct. Thus, at the time of Hock's treatment at the Lebanon VA Hospital, reporting his condition to the DMV was seemingly prohibited by 38 U.S.C. § 3301.

■ Furthermore, because Hock's treatment was, in part, for alcoholism, an additional statutory provision prohibited Garber from identifying Hock or Hock's condition to the DMV. At the time of both Hock's hospitalization between March 23 and April 2, 1976, and his outpatient visit on August 9, 1976, the release of information concerning patients receiving treatment for alcoholism was restricted by the provisions of 42 U.S.C. § 4582.[27] Subsections (b) and (e)

---

**26.** One of the state statutes at issue was a Maryland statute requiring the reporting to the Department of Motor Vehicles of the State of Maryland information concerning persons diagnosed as having a mental disorder or disability.

**27.** That section provides, in pertinent part:

(a) Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to alcoholism or alcohol abuse education, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

(b)(1) The content of any record referred to in subsection (a) of this section may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g) of this section.

(2) Whether or not the patient, with respect to whom any given record referred to in subsection (a) of this section is maintained, gives his written consent, the content of such record may be disclosed as follows:

(A) To medical personnel to the extent necessary to meet a bona fide medical emergency.

(B) To qualified personnel for the purpose of conducting scientific research, management audits, financial audits, or program evaluation, but such personnel may not identify, directly or indirectly, any individual patient in any report of such research, audit, or evaluation, or otherwise disclose patient identities in any manner.

(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

 . . . . .

(d) The prohibitions of this section continue to apply to records concerning any individual who has been a patient, irrespective of whether or when he ceases to be a patient.

(e) The prohibitions of this section do not apply to any interchange of records—

(1) within the Armed Forces or within those components of the Veterans' Administration furnishing health care to veterans, or

of section 4582 permit the disclosure of a patient's identity only pursuant to the patient's consent or to court order, in cases of

(2) between such components and the Armed Forces.

. . . . .

(g) Except as provided in subsection (h) of this section, the Secretary shall prescribe regulations to carry out the purposes of this section. These regulations may contain such definitions, and may provide for such safeguards and procedures, including procedures and criteria for the issuance and scope of orders under subsection (b)(2)(C) of this section, as in the judgment of the Secretary are necessary or proper to effectuate the purposes of this section, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

As enacted that provision also contained the following subsection (h):

(h) The Administrator of Veterans' Affairs, through the Chief Medical Director, shall, to the maximum feasible extent consistent with their responsibilities under Title 38, United States Code, prescribe regulations making applicable the regulations prescribed by the Secretary under subsection (g) of this section to records maintained in connection with the provision of hospital care, nursing home care, domiciliary care, and medical services under such Title 38 to veterans suffering from alcohol abuse or alcoholism. In prescribing and implementing regulations pursuant to this subsection, the Administrator shall, from time to time, consult with the Secretary in order to achieve the maximum possible coordination of the regulations, and the implementation thereof, which they each prescribe.

Pub.L.No.93–282, 93d Cong., 2d Sess., § 122(a), 88 Stat. 125. That subsection, as well as 42 U.S.C. § 4582, was superseded as of October 21, 1976, by a substantially identical statute applicable only to the VA, Pub.L.No.94–581, 94th Cong., 2d Sess., § 111, 90 Stat. 2849–52 (codified at 38 U.S.C. §§ 4131–4134). In the interim, and at all times relevant to this case, however, 42 U.S.C. § 4582 was applicable to the VA. Furthermore, prior to proposing its own regulations pursuant to 38 U.S.C. §§ 4132–4134, the VA applied the HEW regulations promulgated pursuant to 42 U.S.C. § 4582(g) through an agencywide memorandum. *See* 45 Fed.Reg. 56082 (Aug. 22, 1980). Those regulations are discussed in note 28 *infra.* Accordingly, at all times relevant to the within case, the HEW regulations applied to the VA.

**28.** *See* note 27. *See also* the regulations promulgated by the Secretary of HEW pursuant to 42 U.S.C. § 4582(g) which were in effect during 1976 and which provided as follows with regard to any consent for a disclosure:

medical emergency, and between and within the armed forces and the VA.[28] In response to the General Counsel's opinion in-

(a) *Form of consent.* Except as otherwise provided, a consent for a disclosure under this part must be in writing and must contain the following:

(1) The name of the program which is to make the disclosure.

(2) The name or title of the person or organization to which disclosure is to be made.

(3) The name of the patient.

(4) The purpose or need for the disclosure.

(5) The extent or nature of information to be disclosed.

(6) A statement that the consent is subject to revocation at any time except to the extent that action has been taken in reliance thereon, and a specification of the date, event, or condition upon which it will expire without express revocation.

(7) The date on which the consent is signed.

(8) The signature of the patient and, when required under § 2.15, the signature of a person authorized to give consent under that section; or, when required under § 2.16, the signature of a person authorized to sign under that section in lieu of the patient.

(b) *Duration of consent.* Any consent given under this subpart shall have a duration no longer than that reasonably necessary to effectuate the purpose for which it is given.

(c) *Disclosure prohibited with deficient consent.* No program may disclose any information on the basis of a consent form—

(1) which on its face substantially fails to conform to any of the requirements set forth in paragraph (a) of this section, or

(2) which is known, or in the exercise of reasonable care should be known, to the responsible personnel of the program to be materially false in respect to any item required to be contained therein pursuant to paragraph (a) of this section.

(d) *Falsification prohibited.* No person may knowingly make, sign, or furnish to a program any consent form which is materially false with respect to any item required to be contained therein pursuant to paragraph (a) of this section.

42 C.F.R. § 2.31 (1976). (In proposed regulations the VA adopted this HEW regulation almost verbatim. 45 Fed.Reg. 56082 (Aug. 22, 1980).) No consent of the type referred to in that HEW regulation was ever given by Hock. Upon admission to Walter Reed Hock had signed an "Authorization for Release of Medical Records." However, that general consent to disclosure did not comply with the requirements of 42 C.F.R. § 2.31. In addition it would seem that that authorization ran only to Walter Reed and not to the VA. In any event, even if Hock did give his consent to the VA, the HEW regulation restricted the purposes for which

terpreting the 1972 amendment to 38 U.S.C. § 3301,[29] Congress enacted Pub.L.No.94–321, which redesignated subsection (9) of 38 U.S.C. § 3301 as subsection (f) and which added a new subsection (f)(2) authorizing the Administrator of the VA to release names and addresses

> to any criminal or civil law enforcement governmental agency or instrumentality charged under applicable law with the protection of the public health or safety if a qualified representative of such agency or instrumentality has made a written request that such names or addresses be provided for a purpose authorized by law
> . . . .

That amendment became law on June 29, 1976, *i.e.*, after Hock's discharge from the Lebanon VA Hospital, but prior to his visit to the VA Outpatient Clinic at Harrisburg on August 9, 1976. Pursuant to the above amendment, the VA issued VA Circular 00–76–28 to all VA field offices and District Counsels. That circular emphasized that the new statute required a written request from a qualified representative of the requesting agency in order for names and addresses to be released. It authorized the

and the persons to whom disclosure pursuant to a patient's consent may be made. *See* 42 C.F.R. §§ 2.33–2.39 (1976). Disclosure to agencies such as the DMV is not provided for. In 42 C.F.R. § 2.40, the regulations provide the following criteria for disclosures not otherwise provided for:

(a) *Criteria for approval.* In any situation not otherwise specifically provided for in this subpart, where consent is given in accordance with § 2.31, a program may make a disclosure for the benefit of a patient from the records of that patient if, in the judgment of the program director or his authorized representative appointed as provided in § 2.17, all of the following criteria are met:

(1) There is no suggestion in the written consent or the circumstances surrounding it, as known to the program, that the consent was not given freely, voluntarily, and without coercion.

(2) Granting the request for disclosure will not cause substantial harm to the relationship between the patient and the program or to the program's capacity to provide services in general.

(3) Granting the request for disclosure will not be harmful to the patient.

acceptance of one continuing request as a sufficient basis for continuous release of the names and addresses to the requesting agency. No such written request was ever made by the Pennsylvania DMV to the VA. Without such a written request, 38 U.S.C. § 3301(f)(2), prohibited the VA from providing Hock's name and address to the DMV on August 9, 1976.[30]

In summary, as to the April 2, 1976, discharge from the Lebanon VA Hospital, federal law and regulations in effect at that time would have prohibited the release of information concerning Hock by the VA to the DMV under any circumstances. After Hock's discharge from Lebanon, the federal statute was amended to permit release of certain information pursuant to a written request. No such written request was made to the VA by the DMV. Accordingly, no disclosure could lawfully have been made by the VA to the DMV after Hock's visit to the VA Outpatient Clinic in Harrisburg on August 9, 1976. Thus, defendant had no ability and no duty to make such disclosure. Accordingly, plaintiffs cannot base any action for negligence upon any alleged breach of that nonexistent duty.

(b) *Circumstances deemed beneficial.* For the purposes of this section, the circumstances under which disclosure may be deemed to be beneficial to a patient include, but are not limited to, those in which the disclosure may assist the patient in connection with any public or private claim, right, privilege, gratuity, grant or other interest accruing to, or for the benefit of, the patient or the patient's immediate family. Examples of the foregoing include welfare, medicare, unemployment, workmen's compensation, accident or medical insurance, public or private pension or other retirement benefits, and any claim or defense asserted or which is an issue in any civil, criminal administrative or other proceeding in which the patient is a party or is affected.

Under the above criteria it would seem that disclosure to the DMV of Hock's condition would not have been the kind of disclosure contemplated by the regulations.

29. *See* pages 1013–14 *supra*.

30. *See Fitch v. Veterans Administration*, 597 F.2d 1152 (8th Cir. 1979). In *Fitch* the VA had received a written request.

### Negligence

 Even if, for any reason, defendant owed a duty to plaintiffs, an appropriate standard of care was in fact met by Garber in his treatment and handling of Hock on August 9, 1976.[31] Plaintiffs have failed, in this Court's opinion by a wide margin, to prove by a preponderance of the evidence that such treatment was negligent in any respect.[32]

Plaintiffs' expert witness, Dr. Michael J. Kaminsky, stated that Garber's treatment of Hock was incompetent in that Garber failed to foresee Hock's vulnerability to violent behavior and to take appropriate precautions. Kaminsky characterized Hock as a man with a life-long pattern of impulsive behavior who reacted violently and suicidally under stress and who, without proper treatment, was likely to react that way again. Kaminsky disputed the contention that Hock's belief in reincarnation neutralized his suicidal ideations since that belief had not stopped Hock from acting suicidally in the past. Accordingly, although conceding that Hock could not have been involuntarily committed as of August 9, 1976, Kaminsky indicated that Garber should have attempted to persuade Hock to hospitalize himself voluntarily.

Kaminsky further testified that, at the least, in lieu of hospitalization, adequate crisis intervention—e.g., much closer follow-up through appointments or telephone calls, an examination of Mrs. Hock by Garber,

31. The Supreme Court of Pennsylvania has described the standard of care applicable to a physician as follows:

> The standard of care required of a physician or surgeon is well-settled. In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment . . . . A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physician or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods . . . .

*Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835, 838 (1959) (citations and footnote omitted) (emphasis in original). *See also Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206, 213 (1971).

32. It is also to be noted that Pennsylvania affords a qualified immunity to, *inter alia*, psychiatrists. Section 603 of the Pennsylvania Mental Health and Retardation Act of 1966, 50 Pa.Stat.Ann. § 4603, provides:

> No person and no governmental or recognized nonprofit health or welfare organization or agency shall be held civilly or criminally liable for any diagnosis, opinion, report or any thing done pursuant to the provisions of this act if he acted in good faith and not falsely, corruptly, maliciously or reasonable cause; provided, however, that causes of action based upon gross negligence or incompetence shall not be affected by the immunities granted by this section.

Plaintiffs have not alleged that defendant acted in bad faith or "falsely, corruptly, maliciously or without reasonable cause." Accordingly, defendant has a qualified immunity from liability unless defendant's actions were grossly negligent or incompetent.

The only Pennsylvania decisions which this Court has found which construe the gross negligence or incompetence standard of § 4603 are two cases dealing with the sufficiency of complaints. In *Rhines v. Herzel*, 481 Pa. 165, 392 A.2d 298, 300 (1978), the facts alleged in the complaint were that "defendants allowed a patient with homicidal tendencies, who required maximum security control, to associate with patients who required no such supervision" and that "because of such lack of supervision [the patient] was able to kill [plaintiff's decedent]." The Supreme Court of Pennsylvania held that those facts "are ones from which gross negligence can be inferred." In *Freach v. Commonwealth*, 471 Pa. 558, 370 A.2d 1163, 1169 (1977), a patient who had been released from a state mental hospital murdered two teenage boys. As against the superintendent of that hospital, the complaint averred that he, among others at the hospital, had failed properly to treat the murderer and had unlawfully terminated supervision and released him from confinement. The Supreme Court of Pennsylvania was "satisfied that the complaint . . . makes allegations of gross negligence or incompetence."

While plaintiffs have sufficiently alleged gross negligence or incompetence, plaintiffs have failed to prove at trial that Garber's treatment of Hock was grossly negligent or incompetent or even negligent.

and social support—should have been provided to Hock and his wife. Kaminsky questioned Garber's opinion that Hock was not drinking heavily at the time and indicated that Hock might merely have been "faking good." In the light of Hock's loss of his son, his return to drinking, and his recent episodes of irrational thinking, Kaminsky characterized the scheduling of a follow-up appointment five weeks later as inadequate. Rather, according to Kaminsky, Garber should have seen Hock again in a week with perhaps a telephone call in between to insure that Hock was not drinking and that he was taking his medication.

In Kaminsky's opinion, a competent examination of Mrs. Hock would probably have revealed that Holden—and Garber— were misguided in relying upon her to supervise Hock. Kaminsky indicated that Mrs. Hock had not demonstrated any ability in the past effectively to influence Hock's behavior. Kaminsky also pointed out that Alcoholics Anonymous was another possible source of support for Hock which was not suggested by Garber.

Additionally, Kaminsky criticized Garber's determination to prescribe Mellaril instead of Thorazine in the light of Hock's previous success on Thorazine. In fact, Hock had in the past said that he thought Thorazine was an effective substitute for alcohol. Mellaril, by contrast, was untried and untested as a medication for Hock.

The thrust of plaintiffs' contentions, based upon the testimony of Kaminsky and others, is that Garber failed adequately to predict that Hock would act violently or suicidally and to protect against that danger. As indicated supra, however, it was seemingly not possible for any psychiatrist to have made that prediction with any confidence. Thus, Dr. Robert L. Sadoff, defendant's expert witness, testified that not even a soothsayer, let alone a psychiatrist, could have foreseen with any reasonable degree of certainty the accident which occurred on August 11, 1976. Hock had not exhibited any violent or suicidal behavior since prior to his hospitalization at Walter Reed in January 1976. Furthermore, there is nothing in the record to indicate that Hock had any history of automobile accidents. Finally, if Hock was indeed a man who reacted violently or suicidally under stress, it is possible that he would have so reacted some time after the death of his son six weeks before August 9, 1976. Instead, Hock had seemingly survived those six weeks reasonably well in the light of his prior medical record. In fact, Hock had taken a Civil Service examination just four days prior to his examination by Garber and Hock told Garber that he (Hock) thought (correctly as it later turned out, see note 1 supra) that he had passed.

A different course of treatment by Garber might perhaps have been preferable. Sadoff indicated that he might have done some things differently. However, that does not mean that Garber's treatment was negligent. Kaminsky's views seem to rely heavily on hindsight. Garber's examination of Hock was seemingly careful and rather lengthy. He made a diagnosis and prescribed a course of treatment based upon his observations of Hock and upon Hock's prior medical records. Garber's examination of Hock occurred in the context of a routine outpatient visit, not an emergency situation. In Garber's judgment, Hock's condition did not present a crisis situation requiring hospitalization or immediate psychiatric intervention. Based on his observations of Hock, Garber concluded that Hock was not actively psychotic, hallucinating or delusional, and that he was not drinking heavily at that time. Garber determined that Hock was competent, employable, and could drive a car. In view of the importance of actual, clinical observation in making a diagnosis, a principle which even Kaminsky accepts, and in view of the entire record in this case, this Court finds Garber's judgment to have been competent.

With the benefit of hindsight, it might have been better practice for Garber to have talked personally with Mrs. Hock. However, it was not negligent for Garber not to have done so in the light of the fact that Holden did talk to her and that Holden did not indicate to Garber that Mrs. Hock was in immediate need of help or that she

could not be relied upon. Similarly, from the point of view of hindsight, it might have been better practice for Garber to have scheduled a sooner follow-up appointment for Hock. However, it had been over four months since Hock's discharge from the Lebanon VA Hospital at the time that Garber saw him, and despite the fact that Hock had, in the meantime, undergone substantial stress due to his son's death, he was apparently coping reasonably well. In that light, it was not unreasonable for Garber to determine that he did not need to see Hock again for a month.[33] Finally, while some doctors might have prescribed Thorazine, Garber's prescription of Mellaril was not medically inappropriate.

In sum, while Garber might have appropriately followed a different course of treatment, the course he followed was not negligent. *See Donaldson v. Maffucci,* 397 Pa. 548, 156 A.2d 835, 838 (1959) (quoted *supra* at note 31).[34]

### Conclusion

For all of the reasons stated *supra,* judgment will be entered for defendant.

---

33. Of course, even if Garber had seen Hock sooner, that alone would probably not have prevented the accident which occurred 12 days later unless the appointment had been made, and kept, within that 12-day period.

34. Under the circumstances, there is no need to explore whether the record in this case establishes the existence of a causal connection between the treatment received by Hock on August 9, 1976, and the accident which occurred on August 21, 1976.