712 P.2d 950

Vickie JOHNSON, as guardian ad litem
of Garry Johnson, a minor,
Plaintiff-Appellant,

v.

The UNIVERSITY HOSPITAL, the Uni-
versity of Arizona, the Arizona Board
of Regents, the State of Arizona, a body
politic, Defendants-Appellees.

No. 1 CA–CIV 6696.

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 17, 1985.

Review Denied Jan. 21, 1986.

Lars Pedersen, Jacqueline Schneider,
Frederick S. Klein, Tucson, for plaintiff-ap-
pellant.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, P.A., by M.E. Rake, Jr., Calvin L. Raup, Larry L. Smith, Phoenix, for defendants-appellees.

## OPINION

OGG, Judge.

This is a medical malpractice action brought pursuant to A.R.S. § 12–561 *et seq.* Plaintiff-appellant, Vickie Johnson, brought action on behalf of her son, Garry Johnson, against the defendants-appellees University Hospital, University of Arizona, Arizona Board of Regents and the State of Arizona. Following trial, the jury returned a verdict in favor of the defendants and the trial court subsequently entered judgment in accordance with the verdict. Plaintiff appeals from the judgment as well as the denial of her motion for a new trial.

## FACTS

Prior to discussing the legal issues presented for review, we review the facts in a light most favorable to sustaining the verdict and judgment below. *McFarlin v. Hall*, 127 Ariz. 220, 619 P.2d 729 (1980).

On November 21, 1975, six-year-old Garry Johnson fell and broke his wrist while playing on monkey bars at a school playground in Tucson, Arizona. Garry was taken to the emergency room of nearby University Hospital where he was examined by Dr. Richard Romfh, a resident rotating through orthopedic service at University Hospital. Dr. Romfh determined that Garry had suffered a compound fracture of his wrist, resulting in one of the bones tearing through his skin. Additionally, the wound had been contaminated with particles of dirt and asphalt from the school playground. Dr. Romfh decided that surgery was required. He also ordered that an antibiotic, Keflin, be administered in the emergency room prior to surgery. Dr. Romfh testified that he ordered Keflin administered because Garry was allergic to penicillin.

Surgery was performed by Dr. Donald Speer, an orthopedic surgeon on the staff at University Hospital, with Dr. Romfh and Dr. Leonard Peltier, chief of the orthopedic surgery department at University Hospital, in attendance. The wound was cleaned (debrided) by scraping the bone marrow cavity, then irrigating the wound with sterile saline solution. Cultures were taken during the course of the operation and sent to the bacteriology laboratory for analysis to determine the nature of any contaminating organisms. The fracture was set and Garry's arm was put in a long-arm, circular plaster cast.

Shortly after midnight on November 22, 1975, the day after surgery, Dr. Romfh cut a pie-shaped piece out of the cast, near the thumb, because of swelling in that area. On November 24th, Dr. Romfh performed a "bivalve" on the cast. This consisted of making two parallel cuts along the length of the cast, thereby loosening the cast and relieving external pressure on the wound. Later that day the culture and sensitivity reports from the bacteriology department with respect to the cultures taken from the wound during surgery were returned. Based upon the reports, Garry's antibiotic was changed from Keflin to Gentamicin because it provided more specific coverage of the organisms identified. Gentamicin was chosen over ampicillin due to Garry's allergy to penicillin and the resulting fear of anaphylactic shock reaction.

On the morning of November 25th, Dr. Speer ordered a complete blood count (CBC), which reflected an increase in Garry's white blood cell count. The increase in the white blood cell count, coupled with a persistent fever, indicated the likelihood of an infection in the wound. That, along with concern over the existence of pressure within the fascia [1] which might lead to a

---

1. Fascia is a thin layer of tissue, or membrane, which covers the body under the skin, giving the

tissues firmness and support. It also covers

compartment syndrome [2], resulted in the decision to perform surgery.

Surgery was performed on November 25th. The procedure involved removing the cast as well as the dressing underneath the cast and opening up the center portion of the incision that had been made at the time of the initial surgery on November 21st. The surgeon, Dr. Speer, examined the wound but found no indications of infection. Additionally, according to Dr. Speer, there was no evidence of damage from either compartment pressure or pressure from the cast. There was, however, visibly damaged tissue in the area that had been crushed by the fractured bones. Cultures were again taken and the would area debrided.

Following surgery, Dr. Speer chose to place Garry's arm in a circular plaster cast once again. Dr. Speer's rationale for choosing the plaster cast was his desire to immobilize the fracture and to immobilize the soft tissue in that area.

Dr. Speer's postoperative physical examination indicated two significant changes in Garry's condition. First, a decrease in sensation of the fingers and thumb was apparent. Second, when Garry tried to straighten out his fingers, he had great difficulty in doing so and complained of some pain in his forearm rather than at the fracture site. Dr. Speer testified that Garry's symptoms were confusing because, while the physical signs were consistent with a compartment syndrome, the lack of severe pain was inconsistent with such a diagnosis. Nevertheless, Dr. Speer decided to take Garry back into surgery early on the morning of November 26th.

Dr. Speer began the surgical procedure by removing the plaster cast and the underlying dressings. Dr. Speer then examined the wound, noting some soft swelling. A procedure known as "fasciotomy" was then performed. The procedure involves making an incision from the middle of the palm up to the elbow, opening up the arm and

exposing all of the muscles in the arm. The fascia which surrounds the arm was then cut from one end of the incision to the other. Each individual muscle is also surrounded by its own fascia and Dr. Speer then cut into the fascia compartment of each individual muscle so that each muscle was released in sequence. Dr. Speer did not notice any swelling or bulging during the procedure, which indicated the lack of a significant compartment syndrome. Dr. Speer also removed areas of dead skin and debrided the wound. Additionally, specimens of damaged muscles were excised to be examined in the laboratory.

After the operation was completed, Dr. Speer elected to leave the wound open. He placed gauze sponges, soaked in saline solution, over the wound. Dry gauze sponges were then placed over the wet sponges and the arm was then wrapped with soft cotton-like material and placed in a plaster cast.

Dr. Speer testified that the object of applying the dressings over the open wound was to prepare the tissue for skin grafting and reconstructive procedures. Additionally, Dr. Speer stated that the use of fluffy gauze and dressings allows the wound to drain out any infectious materials. Following the November 26th procedure, surgery was again scheduled for December 1st.

Following the November 26th surgery, Garry experienced little pain over the next few days. Also, Garry's white blood cell count fell from 29,000 on the 26th to 15,000 on the 29th. Garry continued to experience a low-grade fever. Dr. Speer testified that these signs were consistent with the existence of a continuing infection or the possibility of a developing infection. However, the antibiotic, Gentamicin, was discontinued based upon Dr. Speer's conclusion that it was not effectively combating infection.

Dr. Speer stated that it was necessary to wait five to seven days after opening the wound before attempting a skin graft so

individual muscles, adding to their functional efficiency.

**2.** Compartment syndrome occurs when pressure builds up in the affected area.

that granulation tissue [3] could form. Garry underwent surgery as scheduled on December 1st. The purpose of the December 1st surgery was threefold. First, Dr. Speer wanted to examine the arm again to assess the status of the tissue. Second, further debridement was to be performed to remove any dead tissue. The third objective was to perform a skin graft, if sufficient granulation tissue had formed. Upon removing the cast and dressings, Dr. Speer discovered additional dead tissue in the area of the fracture, which was removed. A skin graft was performed over a region of the damaged ulnar nerve; however, infection was discovered in the upper arm near the site of the fracture so that a skin graft was not attempted in that region. A stainless steel pin was also inserted across the fracture site to hold the fracture in place. Dr. Speer testified that the reason for waiting until December 1st to insert the pin was to decrease the likelihood of infection developing as a result of introducing a foreign body (pin) into the wound. Tissue samples were also taken during the operation.

On December 3rd, Garry was transferred to the care of Dr. Earle Peacock, then head of the department of surgery at University Hospital. Under the care of Dr. Peacock, Garry underwent several reconstructive surgeries. However, despite a multitude of surgical procedures, Garry's hand is deformed and virtually useless.

Suit was originally brought in Pima County Superior Court. However, the Attorney General obtained removal of the action to Maricopa County Superior Court pursuant to A.R.S. § 12–824(B).[4] The matter was referred to a medical liability review panel as required by A.R.S. § 12–567. Following a hearing, the panel found in favor of plaintiff as to three of her claims of malpractice. The panel held for the defendants as to the remaining six claims of malpractice.

Prior to trial, plaintiff's counsel wrote a letter to the chairman of the review panel, requesting assistance in obtaining expert medical testimony for trial pursuant to A.R.S. § 12–567(J).[5] Several letters were exchanged between the panel chairman and plaintiff's counsel. However, no experts were referred to plaintiff by the panel.

The action proceeded to trial in March, 1982. The trial concluded in April, 1982, with a jury verdict in favor of the defendants. Plaintiff's subsequent motion for new trial was denied, giving rise to this appeal.

## A.R.S. § 12–567(J) ASSISTANCE

The medical liability review panel's decision was filed on May 11, 1981. On May 27, 1981, plaintiff's counsel wrote the following letter to panel chairman, Maricopa County Superior Court Judge John H. Seidel:

Pursuant to the provisions of A.R.S. § 12–567(H), we request that the panel that heard the evidence in the above matter assist us in obtaining expert medical testimony regarding the issues upon which the panel ruled in favor of the Plaintiff for our presentation at trial.

Please advise if it is necessary to petition formally to implement this request.

Judge Seidel responded to counsel's letter, requesting that she be more specific in her request:

Regarding your letter of May 27, 1981, I will be pleased to assist you in obtaining expert medical testimony as provided in A.R.S. § 12–567(H). However, I feel

---

3. Granulation tissue forms at the site of a wound during the early stages of healing and consists of small blood vessels and fibers.

4. At the time of trial, A.R.S. § 12–824(B) provided:

Upon written demand of the attorney general, made at or before the time of answering, served upon the opposing party and filed with the court where the action is pending, the

place of trial of any such action shall be changed to Maricopa County.

The statute has since been amended and renumbered as § 12–822(B). Reference herein is to the statute in effect at the time of trial.

5. A.R.S. § 12–567 was amended in 1982; this provision now appears in subsection I of the statute.

that the plaintiff has an obligation under the statute to be specific in what type of assistance is being requested and the reasons why such assistance is needed.

Plaintiff's counsel responded to Judge Seidel's letter as follows:

Regarding our request that you appoint an expert to assist us in our presentation of Garry Johnson's claim at trial, the assistance we need is to support the three issues upon which your panel found for the Plaintiff.

It is our understanding that in order for the panel to make a finding on any issue for the Plaintiff, the Plaintiff must have presented expert medical testimony on that particular issue(s), therefore the assistance contemplated by A.R.S. § 12–567H is in addition to any testimony and/or assistance the Plaintiff has obtained prior to the panel's decision.

Because it has been determined that venue is in Maricopa County, Dr. Cortner has charged Plaintiff $1,845.00 to date for his appearance in your Court. To avoid this expense in future proceedings, we will require the assistance of *an* expert witness from Maricopa County. (emphasis added)

Thus, it appears that counsel's request is for an expert from Maricopa County to replace Dr. Cortner, due to the expenses associated with requiring Dr. Cortner to appear in Maricopa County Superior Court.

The correspondence between plaintiff's counsel and panel chairman, Judge Seidel, terminated with Judge Seidel refusing counsel's request for assistance. In his letter of June 18, 1981, Judge Seidel writes:

... I interpret your letter as indicating that you do have available expert testimony to support your client's position in this case.

\* \* \* \* \* \*

Finally, I will again state that before proceeding further, I think that there needs to be a showing specifically what assistance is required and/or requested. The word "assist" to me means to help someone accomplish something. It does not mean, at least to me, that the one

rendering such assistance completely take over the task. Thus, for the foregoing reasons and in my capacity as Chairman of the Panel, I am at this time refusing your request that an expert be "appointed".

Plaintiff's counsel made no further attempts to specify the type of expert assistance required, or to otherwise contact Judge Seidel in regard to her request for assistance in obtaining expert medical testimony.

During the time at issue, A.R.S. § 12–567(J) provided, in pertinent part:

If a finding is made by the panel for the plaintiff and the plaintiff proceeds with litigation, the panel *shall assist* the plaintiff in *obtaining* expert medical testimony for any subsequent litigation based upon such claim ... (emphasis added)

Plaintiff raised the issue of failure of the medical liability review panel to assist her in obtaining expert medical testimony for the first time in her motion for new trial. Clearly this did not afford the trial court an opportunity to consider plaintiff's assertions prior to trial.

Plaintiff asserts that she was not obligated to raise the issue prior to trial, since the trial court had no authority to compel the panel chairman to assist plaintiff in obtaining expert medical testimony. While it is true that the trial court may not have had the authority to compel the panel chairman to assist plaintiff, other options were available. For instance, a stay of the trial court proceedings could have been requested pending plaintiff's filing of a special action challenging the panel chairman's refusal to perform a statutorily imposed duty. *See* Rule 3(a), Rules of Procedure for Special Actions. However, plaintiff's failure to timely present this issue to the trial court deprived the trial court of the opportunity to consider the alternatives. It would be patently unfair to permit a party to proceed through trial to judgment and then, if dissatisfied with the result, obtain a new trial based upon an issue which had ripened

prior to trial but was not previously disclosed to the court or adverse parties.

■ We conclude that plaintiff has failed to timely present her claim concerning assistance from the medical liability review panel to the trial court and is therefore precluded from urging this issue on appeal. *See Gustafson v. Riggs,* 10 Ariz.App. 74, 456 P.2d 92 (1969).

## CHANGE OF VENUE

As previously noted, suit was originally filed in Pima County Superior Court. The Attorney General demanded removal of the action to Maricopa County pursuant to A.R.S. § 12–824(B). Plaintiff opposed the demand but following a hearing, the change of venue was ordered granted on September 1, 1978. Plaintiff filed a motion for rehearing in Pima County; however, the clerk of the court forwarded the case file to Maricopa County prior to the scheduled hearing date. Plaintiff filed a petition for special action on September 27th, challenging the transfer of venue to Maricopa County; however, the Arizona Supreme Court declined to accept jurisdiction.

Plaintiff moved for a change of venue in Maricopa County Superior Court pursuant to A.R.S. §§ 12–406 and –407, claiming *forum non conveniens.* Plaintiff sought that the action be removed back to Pima County. The motion was denied. In her motion for new trial, plaintiff asserted that she was prejudiced in having to try the case in Maricopa County.

The first issue pertaining to change of venue raised by plaintiff is that A.R.S. § 12–824(B) does not preclude a change of venue where Maricopa County is a *forum non conveniens.* Plaintiff takes the position that, after the Attorney General obtains removal to Maricopa County pursuant to A.R.S. § 12–824(B), another party to the action may then seek removal of the action to another county pursuant to A.R.S. § 12–406(B)(2). Plaintiff relies upon the

case of *Ford Motor Company v. Superior Court,* 125 Ariz. 112, 608 P.2d 49 (App. 1979), to support her assertion. In *Ford Motor Company,* the plaintiff sued Ford and the State of Arizona in Pima County. Pursuant to A.R.S. § 12–824(B), the Attorney General had the action moved to Maricopa County. Following transfer, the State settled with the plaintiff, leaving Ford as the sole defendant. The plaintiff *thereafter* filed a motion for change of venue back to Pima County pursuant to A.R.S. § 12–406(B)(2) *(forum non conveniens ).* The trial court granted the motion and Ford filed a petition for special action challenging the trial court's ruling. Ford asserted that, since the action had already been transferred once, the trial judge exceeded his jurisdiction in granting a second change of venue. *See* A.R.S. § 12–411(A).[6]

■ In *Ford Motor Company* we held:

We believe that if the legislature intended the one change of venue limitation in § 12–411 to apply to the situation in this case, it would have included suits against the state in the venue requirements of § 12–401. *We find that a change of venue at the instance of the State pursuant to A.R.S. § 12–824(B) is outside of the restrictions of A.R.S. § 12–411 and does not constitute the single change of venue contemplated by that section.* The mandatory nature of a change of venue, if exercised by the State under A.R.S. § 12–824(B), *coupled with the fact that it is set apart from the venue provisions of A.R.S. § 12–401 et seq., in a different chapter of Title 12,* leads us to this conclusion. (emphasis added—footnote omitted).

*Id.* at 113, 608 P.2d at 50. *Ford Motor Company* stands for the proposition that the exercise of the State's option to have venue changed to Maricopa County does not constitute the single change of venue contemplated by § 12–411(A). However, it does not support plaintiff's assertion that § 12–406 may be utilized by a party to

---

6. A.R.S. § 12–411(A) provides:

Not more than one change of venue or change of judge may be granted in any action, but each party shall be heard to urge his objections to a county or judge in the first instance.

obtain a second change of venue after the Attorney General has exercised his option to have venue changed to Maricopa County and the State is still a party to the lawsuit. In fact, reading *Ford Motor Company* in conjunction with *State v. Superior Court,* 120 Ariz. 273, 585 P.2d 882 (1978), we are convinced that actions in which the Attorney General obtains a change of venue to Maricopa County pursuant to § 12–824(B), and the State remains a party to the action, are not subject to the change of venue provisions of § 12–406. Our conclusion is based upon the fact that removal under § 12–824(B) is mandatory when requested by the Attorney General and that the statute falls under Chapter 7 of Title 12 entitled "SPECIAL ACTIONS AND PROCEEDINGS IN WHICH THE STATE IS A PARTY", whereas § 12–406 falls under Chapter 4 which does not include suits against the State in the venue requirements of § 12–401.

Plaintiff also attacks the constitutionality of § 12–824(B), claiming that it is violative of the equal protection and due process clauses of the federal and state constitutions. However, we read the Arizona Supreme Court decision in *State v. Superior Court, supra,* as, at least impliedly, upholding the constitutionality of § 12–824(B). *See also Gila Valley Irrigation District v. Superior Court,* 144 Ariz. 288, 697 P.2d 681 (1985). This court lacks authority to disaffirm prior decisions of the Arizona Supreme Court. *McKay v. Industrial Commission,* 103 Ariz. 191, 438 P.2d 757 (1968); *In re Marriage of Berger,* 140 Ariz. 156, 680 P.2d 1217 (App.1983). Consequently, the constitutionality issue is not addressed by this court.

■ Plaintiff's final argument pertaining to change of venue is that cases brought under the Health Care Act (A.R.S. § 12–561 *et seq.*) are excepted from the provisions of § 12–824. Plaintiff asserts that the legislature, in creating the Health Care Act, made fundamental changes in what had previously been a common law cause

of action for negligence, and in doing so created a new, statutory form of action relating to health care. Thus, asserts plaintiff, the cause of action is not for "negligence" but for the statutory cause of action, "medical malpractice" and § 12–564(B) is not applicable.

A.R.S. § 12–561(2) provides in pertinent part:

"Medical malpractice action" or "cause of action for medical malpractice" means an action for injury or death against a licensed health care provider based upon such provider's alleged *negligence, misconduct, errors or omissions, or breach of contract* in the rendering of health care, medical services, nursing services or other health-related services ... (emphasis added)

The State was entitled to removal under § 12–824 on "claims on contract or for negligence". A.R.S. § 12–821.[7] Consequently, the issue to decide is whether the presence of the words "misconduct, errors or omissions" in § 12–564(2) somehow provides a basis for recovery other than in negligence or contract.

A.R.S. § 12–563 provides:

The following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs with the state acting in the same or similar circumstances; and
2. Such failure was a proximate cause of the injury.

This standard is substantially the same as had been applied in Arizona prior to passage of the Health Care Act, when actions were based upon common law negligence:

Where, as here, the duty which the law recognizes arises because the defendant has held himself out to be trained in a

---

7. A.R.S. § 12–821 was repealed in 1984. Under the current law the State may seek a change of venue to Maricopa County in *any* action filed against the State. *See* A.R.S. § 12–822(B).

44

particular trade or profession, the standard required for the protection of others against unreasonable risks is that *the defendant exercise the skill and knowledge normally possessed by members of that trade or profession in good standing in similar communities.* (emphasis added) *Kreisman v. Thomas,* 12 Ariz.App. 215, 220, 469 P.2d 107, 112 (1970). In fact, this is the negligence standard generally applied to all persons holding themselves out as possessing special knowledge, skill or expertise. *See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984); *National Housing Industries, Inc. v. E.L. Jones Development Co.,* 118 Ariz. 374, 576 P.2d 1374 (App.1978).

We find that the plaintiff's action is not excepted from the provisions of § 12–824.

## REBUTTAL

Plaintiff claims that the trial court erred in restricting her rebuttal examination of Dr. Peacock concerning matters raised by the defense in the presentation of its case.

■ What constitutes proper rebuttal is within the trial court's discretion, and in the absence of an apparent abuse thereof its action will not be reversed on appeal. *State v. Young,* 116 Ariz. 385, 569 P.2d 815 (1977). Our review of the record indicates that the trial court placed little, if any, limitation on plaintiff's examination of Dr. Peacock during rebuttal. In fact, it appears that the trial court ruled in favor of plaintiff on this issue:

> THE COURT: I am going to take the position that cross-examination of the so-called defendant's doctors, does not mean that you could have presented in your case in chief, I will permit you to rebut it, if it was presented, especially, in the forceful areas on their case. So, I am not going to preclude rebuttal simply because there was a general reference or allusion to that area when the defendant doctors were called on cross-examination.

> *      *      *      *      *      *

I think, generally, most of it is legitimate rebuttal and, if your testimony is going to rebut, I would allow it, but that is what I can't quite grasp.

MS. SCHNEIDER: I guess we won't know whether it will go to rebut it.

THE COURT: There has been some things that have been testified to, I really don't intend to let you repeat them. I will do this, counsel, since I think the ruling basically is in favor of allowing the rebuttal, if there is something that appears not to be proper, I would allow you more than usual to approach the bench so that you don't have to alienate yourself with the jury.

I know it's difficult, I wanted to avoid it. If something is not appropriate and you want to approach the bench, I will allow you to do it.

Plaintiff cites to no instances in which the trial court restricted her examination of Dr. Peacock during rebuttal. We find no abuse of discretion in the trial court's ruling concerning the scope of rebuttal.

## CROSS–EXAMINATION

Plaintiff maintains that the trial court committed reversible error in restricting her cross-examination of defendants' witness, Dr. Kelly.

■ The control of cross-examination is left to the sound discretion of the trial court and will not be disturbed on appeal absent a showing from the record of an abuse of discretion. *State v. Smith,* 138 Ariz. 79, 673 P.2d 17 (1983).

Dr. Kelly testified as an infectious disease expert. Plaintiff claims that the trial court erred in sustaining defendants' objections when plaintiff questioned Dr. Kelly concerning the surgical treatment of a wound infection. The record concerning plaintiff's questioning of Dr. Kelly in regard to the surgical standard of care and treatment of wound infections discloses the following:

> Q. [Defense Counsel] Doctor, the question that Mr. Pedersen was asking you, does that come within your realm of

expertise or is that within the realm of expertise of a surgeon?

A. Within the realm of expertise of a surgeon.

MR. RAKE: No foundation, Your Honor.

THE COURT: You may attempt to lay further foundation. *He may be aware of the answer.*

BY MR. PEDERSEN [Plaintiff's Counsel]:

Q. From your experience in dealing with contaminated—strike that.

Doctor, you deal with contaminated wounds, do you not?

A. I am asked to see patients who have contaminated wounds.

Q. And—

A. I should point out that I don't treat them.

Q. But, you have told us about one case here earlier that you were involved in the treatment?

A. Yes.

Q. There was surgical involvement by a surgeon in that case, was there not?

A. That is correct, that is the notion that I think I was trying to get across, that I am not the exclusive physician in such instances.

\*　　\*　　\*　　\*　　\*　　\*

Q. Doctor, are you qualified to give us an opinion as to the standard of care for surgical treatment of an infection?

A. All infections? *I am not qualified to give you a standard of care on the surgical treatment of all infections.*

Q. Are you qualified to give us an opinion on the surgical treatment of a wound infection?

A. Only with regard to selection of antibiotics, method of diagnosis, and *general surgical principles.*

Q. With that in mind, are you—or can you give us an opinion as to the standard of care for the treatment of an open wound regarding infection?

A. Within the limits of what I just answered, yes.

Q. Do you know what the standard of care is in terms of whether a wound which is contaminated, possibly infected, whether or not that should be left open?

A. *My understanding is that it is within the realm of surgical judgment.*

Q. So, you can't give us an opinion?

A. *I can't give you the same sort of an opinion you would get from a qualified surgeon,* I am not a surgeon.

Q. Doctor, the wound on the 26th, after the fasciotomy was wrapped with a web roll or webral material and then a cast was placed on that, are you familiar with that?

A. Yes, I am.

\*　　\*　　\*　　\*　　\*　　\*

Q. On the 27th of December, after the fasciotomy, do you have an opinion as to whether pus, if it formed, would drain?

A. *I don't have an opinion.*

Q. Doctor, when tissue dies and becomes necrotic, it is more susceptible to infection and the infectious process; is that correct?

A. That is correct.

\*　　\*　　\*　　\*　　\*　　\*

Q. In terms of Garry Johnson, if he was developing infection on the 28th of November, would it not be important to place heat on the wound?

A. Probably not. This was a wound that on the 26th, had been widely opened and necrotic tissue removed. There is no way to effectively place heat on such a wound. Whether or not it is in a cast.

Q. Would it be important to probe the wound on the 28th?

A. That would depend on a judgment of the person at the bedside.

Q. That person would have to look at the wound to make that judgment; is that correct?

A. If, indeed, he thought he should look at the wound. (emphasis added)

Contrary to plaintiff's assertion, she was not precluded by the trial court from cross-

**46**

examining Dr. Kelly concerning the surgical treatment of a potentially contaminated wound. The trial court permitted counsel to question Dr. Kelly, to the extent that surgical treatment of infected wounds fell within the realm of his expertise. It was Dr. Kelly, and not the court, who determined the parameters of his expertise.

Plaintiff points out that defense counsel questioned Dr. Kelly on redirect examination concerning the case of a drain in a wound over which a plaster cast had been placed:

Q. Now, you were asked some questions about surgical drains, do you recall testimony on cross-examination on that subject matter?

A. Yes.

Q. In your opinion, doctor, is there any need for a drain in a wound that has been left open from the wrist to the elbow?

A. Well, *I am not a surgeon,* but it is not apparent to me that a wound like that needs a drain.

Q. Why is that?

A. Well, if it is opened in its entire course, then I don't see what putting in a small rubber tube would add to drainage that's already available. I mean, that wound is open and whatever is in there, I presume, can get out. (emphasis added)

Dr. Kelly qualified his opinion in stating "I am not a surgeon"; moreover, plaintiff did not object to Dr. Kelly's expressing an opinion concerning the utilization of a drain. Once again, there is no adverse ruling by the trial court upon which plaintiff may attribute reversible error.

The record does not reflect an abuse of the trial court's discretion concerning the cross-examination of Dr. Kelly.

STAFF NEGLIGENCE

Plaintiff argues that the trial court committed reversible error in modifying her requested jury instruction pertaining to the standard of care under A.R.S. § 12–561, thereby deleting from it any reference to nurses or other non-physician hospital staff. Consequently, the jury was instructed to consider only the alleged negligence of the physicians.

Plaintiff asserts that the record contains sufficient evidence from which the jury could infer: (1) the proper standard of care for nurses; and (2) that the standard had been breached. However, the plaintiff has the burden of establishing what conduct the standard of care requires and that the defendant has failed to comply with that standard. *Kreisman v. Thomas, supra.*

In our opinion, the plaintiff carried the burden of establishing the standard of care as set forth in the *Restatement (Second) of Torts* § 299A (1965):

Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

In this case, it was incumbent upon the plaintiff to establish the standard of care normally possessed by nurses in similar communities. *See Powder Horn Nursery, Inc. v. Soil and Plant Laboratory, Inc.,* 119 Ariz. 78, 579 P.2d 582 (App.1978).

Plaintiff asserts that the following testimony from Drs. Romfh and Taber sufficiently establishes a standard of care for University Hospital nurses, as well as providing a basis from which the jury could reasonably infer that the nursing staff fell below that standard. Dr. Romfh testified as follows:

Q. Had you seen Nurse Hughes' note at 2300 hours on the 23rd?

A. I don't know whether I read her note on the 24th. I've seen it since then.

Q. You would agree with me that fingers cool, cold, very dark, dusky color, capillary return very slow, movement very poor, only slightly and very little extension, fingers appear to be more swollen than yesterday, you would agree with me that those are indications that there has been some compromise of circulation, would you not?

A. I would agree with you that if what she saw was accurate, there would be. But, I am surprised she didn't contact anyone or didn't write down that she called anyone about that.

Q. Those were the kind of signs that someone should be called or contacted, weren't they?

A. They should be.

Q. And, either a resident should have—strike that.

A resident should have been notified and a resident should have looked at it and a resident should have note—made a note, or a resident should have contacted an attending and talked to him about it, should he not?

A. Should.

Dr. Taber later testified:

Q. Tell me, if you would, what the obligation of the physician is when a nurse writes down an entry in the chart such as, fingers cool, cold, dusky, sensation limited, something of that sort, what is the obligation of the physician at that time?

A. Well, at the time that that occurs, if the physician is there to read that entry, then, of course, he is going to go check the situation himself. So, when she writes the entry in the chart it becomes the obligation of the physician to know.

However, I would have to qualify that to some extent because if the patient [sic] writes this at 3 o'clock in the morning, the physician has got to be notified about it. So, the nurse must then notify him if she thinks there is a problem.

Dr. Romfh further testified:

Q. Dr. Romfh, when a nurse would call you or contact a physician, they would usually put a note in the progress note in the chart that they had contacted the physician, would they not?

A. Yes, they would.

The above testimony falls short of establishing a standard of care. While Dr. Romfh testified that, in his opinion, Nurse Hughes "should" have contacted a resident physician based upon her observations and note of November 23rd, there is no evidence or testimony to the effect that the failure to do so fell below the prevailing standard of care. The standard of care must be established by specific evidence; it cannot be left to conjecture or inference. *See Powder Horn Nursery, supra; Kreisman v. Thomas, supra.* In the absence of evidence establishing the requisite standard of care for the nursing staff, there was no basis upon which the jury could have found negligence on the part of the University Hospital nursing staff. *See Powder Horn Nursery, supra; Kreisman v. Thomas, supra.* Consequently, the trial court did not err in refusing to instruct the jury as requested by plaintiff.

The judgment of the trial court is affirmed.

FROEB, J., concurs.

CORCORAN, Judge, dissenting:

I respectfully dissent.