735 P.2d 830

**Laura U. COOKE, Plaintiff-Appellant,**

**v.**

**Sanford BERLIN and Jane Doe Berlin, husband and wife; State of Arizona, Defendants-Appellees.**

**No. 1 CA–CIV 8529.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 8, 1987.

This case being settled pending appeal, Review Dismissed April 14, 1987.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Michael J. Meehan,

David A. McEvoy, Tucson, for plaintiff-appellant Cooke.

Leonard Everett, Tucson, for defendant-appellee Berlin.

Snell & Wilmer by Robert J. Gibson, Eileen J. Moore, Phoenix and Robert K. Corbin, Atty. Gen. by A. Glen Reesing, Asst. Atty. Gen., Phoenix, for defendant-appellee State.

## OPINION

JACOBSON, Presiding Judge.

In this case of first impression in Arizona, we must determine whether a psychiatrist and his employer are liable to the surviving spouse of a person who was killed by an individual who received treatment as an out-patient.

The facts are taken in a light most favorable to the plaintiff-appellant, Laura U. Cooke, against whom summary judgment was entered. In late 1981 and early 1982, Tanya Robinson, a single 22 year old student at the University of Arizona, came to believe that she was the subject of surveillance by the Central Intelligence Agency (CIA). She conveyed this belief to her sister who recommended that she seek help from the Southern Arizona Mental Health Center (SAMHC). SAMHC is a tax-supported public health facility operated by defendant-appellee State of Arizona. *See generally* A.R.S. § 36–501, *et seq.* Robinson was first seen at SAMHC on February 11, 1982, by Gypsy Barker Lyle, a social worker, who took a history from Robinson and came to a working diagnosis of "paranoia." Robinson was seen on February 23, 1982, by defendant-appellee, Dr. Sanford Berlin, a psychiatrist employed as a consultant to SAMHC. Berlin agreed with Lyle's diagnosis of paranoia and prescribed Navané, an anti-psychotic drug.

On February 26, 1982, Robinson was taken off Navane, because of adverse side effects, and Trifluoperazine was prescribed. Robinson was seen on March 9, but cancelled her March 17 and 29 appointments. She was also seen again at the clinic on April 1 and 22, but cancelled her April 9 appointment. She was last seen at the clinic on May 24, 1982.

At the March 9 appointment, Robinson told Lyle that she was now convinced that the CIA was not responsible for the continuing surveillance of herself and home, but that she still felt the surveillance was continuing. Lyle concluded that the surveillance delusion was connected to Robinson's having been raped in 1981. Although Robinson missed appointments in March, her sister called Lyle and related problems with Robinson not taking her medication and expressing suicidal thoughts. Robinson missed another appointment initiated by Lyle as a result of the sister's call, but was seen by both Lyle and Berlin on April 1 and 22.

In April, Robinson related to Lyle and Berlin that she now concluded that a Tucson disc jockey, Robert Cooke, was responsible for the surveillance which was being carried on through her radio. With Robinson's permission, Lyle contacted Cooke to arrange a meeting between the two. Cooke refused. Both Berlin and Lyle at that point felt that there was no likelihood that Cooke was endangered by Robinson's delusion.

On May 24, 1982, Robinson was seen by Joan Bussanich, a hypnotherapist at SAMHC. Bussanich did not consider Robinson an appropriate candidate for hypnotherapy. Robinson did, however, inform Bussanich that she was going to leave Tucson to get away from Cooke. Bussanich attempted to make another appointment for Robinson to see Lyle on May 25. Although Robinson agreed to call Lyle, she never contacted Lyle or anyone else at SAMHC thereafter. This was the last contact by Robinson with SAMHC.

In early June 1982, Robinson moved to Phoenix, Arizona, and stayed with her sister. In July, she left Arizona and moved to Virginia to live with her grandmother. While in Virginia, Robinson for the first time concluded that the only way she could escape from Cooke's surveillance was to kill him. She never relayed these thoughts to anyone, until after the fatal shooting.

On August 14, 1982, Robinson returned to Tucson, but did not contact her family, friends or anyone at SAMHC. She stole a gun from her parents' home and on August 22, 1982, after waiting for Cooke to leave a bar where he worked as a disc jockey, shot and killed him in a parking lot.

Robinson was subsequently arrested and tried for murder. Pending trial, on petition, she was admitted to Kino Community Hospital where she was again diagnosed as having a paranoid schizophrenic disorder. She was again treated with Navane. She was found not guilty by reason of insanity and was readmitted to Kino on November 22, 1982.

Subsequent testing at Kino revealed several chemical imbalances and a revised diagnosis of "atypical psychosis." Robinson was treated with anti-depressant medication and her condition improved. On June 22, 1983, Robinson was discharged to SAMHC's halfway house.

Laura U. Cooke, Robert Cooke's surviving spouse, commenced this action against the State of Arizona, Berlin and Robinson in Pima County Superior Court. The state sought and was granted a change of venue to Maricopa County pursuant to A.R.S. § 12–824(B).[1] The supreme court declined to review this ruling on a special action brought by Berlin, Robinson and Cooke. Robinson subsequently settled with Cooke and was dismissed from this litigation.

The trial court granted the motion of both the state and Berlin for summary judgment. In doing so, it stated:

"IT IS ORDERED granting the Motions for Summary Judgment finding that the defendants owed no duty to the plaintiff that can form a basis of liability, specifically, that SAMHC could not have reasonably foreseen that Tanya Robinson would injure Robert Cooke.

Further, the Court finds a lack of any evidence of negligence on the part of Barker, Bussanich, Berlin or SAMHC."

Laura U. Cooke has appealed.

## NEGLIGENCE

Before addressing the issues of duty and foreseeability, we dispose of the trial court's contention that Cooke failed to present any evidence of negligence on the part of Berlin or SAMHC.[2] In doing so, we focus on what Cooke contends are the negligent acts giving rise to the alleged liability in this case.

Appellant's allegations of negligence are derived primarily from the opinion of her expert, Dr. Wesley A. McEldoon. Basically, Dr. McEldoon found fault with SAMHC's "system" of having social workers perform the work of a physician. As Dr. McEldoon testified:

I mean, I think there is a real fault in the entire system, any system that would take a person without medical training [Gypsy Baker Lyle] and make them responsible for the diagnosis and medical care of a person that might present to them, any system that puts a non-physician in that position is doing a disservice.

\* \* \* \* \* \*

Q: Let me understand. Are you saying that Gypsy was not qualified to take the initial information and make a diagnosis?

A: That's right.

\* \* \* \* \* \*

Q: So once again you think the system is bad because it doesn't have qualified people, is that what you're saying?

A: Basically, yes.

Q: And you would remedy that by having people with what qualifications again?

A: I would have physicians doing physician [sic] work. I certainly wouldn't have social workers doing physician [sic] work.

Q: That would cost more money, wouldn't it?

1. A.R.S. § 12–824(B) was renumbered as A.R.S. § 12–822(B) by Law, 1984, ch. 285 § 7. This statute in essence requires that upon written demand of the Attorney General, any action against the State of Arizona shall be transferred to Maricopa County for trial.

2. On appeal, appellant does not contend that either Lyle or Bussanich are individually liable.

A: Certainly.

Q: That's one of the problems, isn't it?

A: That's one of the problems.

In addition, Dr. McEldoon concluded that Berlin fell below the applicable standard of care by not re-evaluating the initial misdiagnosis and thus correcting a misguided treatment plan. In Dr. McEldoon's opinion if SAMHC and Berlin had not acted negligently in this case, Robinson would have been cured and thus would not have killed Cooke.

■ In our opinion, this testimony, at least at the summary judgment stage, is sufficient to raise a material issue of fact as to whether the "system" established by the state to render mental health care was deficient, and whether Berlin's treatment of Robinson fell below the applicable standard of care.

■ We also reject the state's argument that assuming arguendo that Berlin was negligent, the state would not be vicariously liable because Berlin was an independent contractor. We reject this argument for two reasons. First, even if Dr. Berlin were an independent contractor, it appears that the state undertook to provide a nondelegable duty to provide adequate care. See DeMontiney v. Desert Manor Convalescent Center, 144 Ariz. 6, 695 P.2d 255 (1985). Second, the appellant has alleged independent negligence of the state in allowing non-physicians to perform work which in the opinion of Dr. McEldoon can only be performed by a physician. Dr. McEldoon was qualified to render such an opinion.

We therefore conclude that the appellant for the purposes of avoiding summary judgment, has raised an issue of fact concerning appellees' failure to meet an appropriate standard of care, in the diagnosis and treatment of Robinson's mental condition.

## DUTY

Having concluded that appellees may have been negligent in the diagnosis and treatment of Robinson, the question remains whether such negligence gives rise to any liability for Robinson's killing of Robert Cooke. In focusing on this issue it is important to state what theories are *not* espoused by the appellant. The appellant does not contend that the appellees had a duty to warn Robert Cooke that Robinson posed a threat to him, as there is no evidence that the appellees knew that Robinson had formed an intent to harm Cooke. *See Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). It is clear that this intent, according to Robinson, was not formed until she was in Virginia, some two months after she was last seen at SAMHC. It is equally clear that this intent was never voiced by Robinson to anyone prior to the shooting.

Also, the appellant does not contend that the appellees had a duty to confine Robinson. *See generally Restatement (Second) of Torts* § 319 (1965). Again, it is conceded that at the time Robinson was under treatment by SAMHC she was not committable under A.R.S. § 36–529(B) as posing a danger to herself or to others.

Appellant does, however, assert that SAMHC and Berlin owed a duty to any third party foreseeably at risk from the negligent diagnosis and treatment of Robinson.

In analyzing this duty issue we start with the recognized concept that "a negligence action may be maintained *only* if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 354, 706 P.2d 365, 366 (1985). In making this legal determination we heed the admonition of the Arizona Supreme Court not to equate the concepts of duty with specific details of conduct. *Coburn v. City of Tucson,* 143 Ariz. 50, 691 P.2d 1078 (1984).[3] We there-

---

**3.** We find this admonition somewhat difficult when attempting to define foreseeability as an element of duty, for we are at a loss to see how foreseeability can be viewed in the abstract. *See Palsgraf v. Long Island Railroad Co.,* 284 N.Y. 329, 162 N.E. 99 (1928), adopted in Arizo-

fore are presented with the broad question of whether any person has the duty to control the conduct of a third person so as to prevent harm befalling another. The answer to this question is a qualified no, as there is no common-law duty to control the acts of another. *Davis v. Mangelsdorf,* 138 Ariz. 207, 673 P.2d 951 (App.1983); *Restatement (Second) of Torts,* § 314 (1965). *See generally* Harper & Kime, *The Duty to Control the Conduct of Another,* 43 Yale L.J. 886 (1934).

The *Restatement (Second) of Torts* § 315 (1965) reflects the general rule of nonliability and its exceptions:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

We can dispose of the exception stated in *Restatement* § 315(b) rather summarily. This exception would require a relationship to exist between appellees and Robert Cooke which would give Cooke a right to protection. At the risk of looking at specific conduct to establish that relationship, the only contact between SAMHC and Cooke was a telephone call from Lyle to Cooke requesting his participation in Robinson's treatment. We finding nothing in this brief contact which would give rise to any obligation to afford Cooke protection, absent a specific threat by Robinson. *See Tarasoff v. Regents of University of California, supra.*

We turn then to the exception stated in *Restatement* § 315(a), dealing with the existence of a special relationship which imposes a duty to control. As stated in the comment (c), *Restatement (Second) of Torts* § 315: "[t]he relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316–319." These relation-

na, *West v. Cruz,* 75 Ariz. 13, 251 P.2d 311

ships are: (1) the duty of a parent to control the conduct of a child (§ 316); (2) the duty of a master to control the conduct of a servant (§ 317); (3) the duty of a possessor of land or chattels to control the conduct of a licensee (§ 318); and (4) duty of those in charge of persons having dangerous propensities to control those persons (§ 319). All of these relationships share the common characteristics of the actor's ability and obligation to control the conduct of the third party. *Seibel v. City and County of Honolulu,* 61 Hawaii 253, 602 P.2d 532 (1979).

■ The appellant argues, however, that regardless of the existence of these control characteristics, the psychiatrist-patient relationship is sufficient, in and of itself, to give rise to duty to control, citing *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980); *Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230 (1983).

In our opinion, the majority and better reasoned cases which have addressed the psychiatrist-patient relationship have concluded that the duty to control should not be imposed solely because of that relationship. *See Abernathy v. United States,* 773 F.2d 184 (8th Cir.1985); *Anthony v. United States,* 616 F.Supp. 156 (D. Iowa 1985); *Hasenei v. United States,* 541 F.Supp. 999 (D. Maryland 1982); *Bradley Center, Inc. v. Wessener,* 161 Ga.App. 576, 287 S.E.2d 716 (1982); *Cartier v. Long Island College Hospital,* 490 N.Y.S.2d 602, 111 A.2d 894 (1985).

The record indicates that the relationship between the appellees and Robinson was completely bereft of any right, opportunity or ability to control her conduct. In this regard, the district court in *Hasenei, supra* held that:

[t]he typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of § 315. Indeed, lack of control by the therapist and maximum freedom for the patient is oft-

(1952).

times the end sought by both the psychiatric profession and the law.

*Hasenei v. United States,* 541 F.Supp. 999, 1009 (1982).

The appellant contends, however, that the necessary "control" for purposes of Restatement § 315, can be analogized from the duty owed by physicians to persons other than their patients for failing to diagnose or warn of contagious or infectious disease, *Skillings v. Allen,* 143 Minn. 323, 173 N.W. 663 (1919), or failing to warn of the side effects of prescribed medication, *Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275 (Mich.App.1984), or failing to warn a patient who suffers seizures not to drive an automobile, *Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973). Whatever may be said about the legal analysis applied in these cases, they are not § 315 "control" cases. This clear distinction was recognized in *Gooden v. Tips,* 651 S.W.2d 364 (Tex.Civ.App.1983), in imposing a duty upon a physician for failing to warn the patient/driver of the side effects of prescribed medication:

> ... We point out that we do not hold that a duty arose on the part of Dr. Tips to *control* the conduct of his patient as was imposed in cases such as *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500 (1979); *Lipari v. Sears Roebuck & Co.* 497 F.Supp. 185 (D.Neb.1980); and *Bradley Center, Inc. v. Wessner,* 161 Ga.App. 576, 287 S.E.2d 716 (1982).... We hold only that, under the facts here alleged, Dr. Tips may have had a duty to *warn* his patient not to drive. We do not hold that he had a duty to *prevent* her from driving, if she so desired." (emphasis in original.)

651 S.W.2d at 370.

This becomes more than simply a game of semantics, for if the psychiatrist-patient relationship does not fall within the "control" exception of § 315(a), we are left with the general common law rule that no duty exists to control the conduct of a third person from causing harm to another.

Where, then, do the "non-control" contagious disease and failure to warn of medication cases fall? In our opinion we should determine whether the policy decisions which gave rise to the imposition of a duty in those cases apply with equal force in this case. In discussing this duty issue, we are mindful that:

> [d]uty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.

Prosser, Law of Torts, 3d. Ed. at 332–333 (1964).

"Those considerations of policy" which have been articulated by the courts and commentators are: (1) the foreseeability of harm to the plaintiff flowing from the defendant's act, (2) the degree of certainty that the plaintiff suffered injury, (3) the "closeness" of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the burden on the defendant and to the community of imposing a duty to exercise due care, and (7) the availability, cost and prevalence of insurance to cover the risk. *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

The contagious and infectious disease cases, when applying these policy considerations, conclude that a duty is imposed upon a physician who attends patients afflicted with contagious or infectious disease not to negligently do any act that would tend to spread the disease, because:

> [t]he health of the people is an economic asset. The law recognizes its preservation as a matter of importance to the state.... The laws ... have been framed to protect the people, collectively and individually, from the spread of communicable diseases.

*Skillings v. Allen,* 143 Minn. 323, 173 N.W. 663 (1919).

Thus, the physician's failure to exercise due care in the diagnosis and treatment of known contagious diseases will result in

immediate and foreseeable consequences to the health of the public at large.

Likewise, the failure to warn of the side effects of medication or results of disorder cases may be harmonized by looking to duty concepts imposed by *Restatement (Second) Torts* § 311 (imposing liability for harm caused by negligently giving false information upon which another can reasonably rely). *See* concurring opinion of Justice Uhlenhopp in *Freese v. Lemmon, supra.*

In our opinion, applying these policy considerations militates against a finding of a duty to control based solely on the psychiatrist-patient relationship. First, it is conceded by Dr. McEldoon that Tanya Robinson at the time she was under the care of the defendants, posed no threat to Robert Cooke and thus the harm suffered by Cooke was not foreseeable. Second, the connection between the defendants' alleged conduct (failure to diagnose and successfully treat) and the shooting of Robert Cooke is remote. This is true not only from a causation standpoint, but also from a time and distance standpoint. The determination by Robinson to kill Cooke was formed some three months after she had unilaterally terminated treatment and while she was in Virginia. Third, imposing liability in this case will not ensure that the treatment and diagnosis of the mentally ill will improve. This is for the simple reason that the ability to diagnose dangerousness and thus control or treat it simply is not that accurate. As was noted by Schopp and Quatrocchi in *Tarasoff, The Doctrine of Special Relationships and the Psychotherapist's Duty to Warn,* Journal of Psychiatry and Law 13, 23 (Spring 1984).

[u]nfortunately, a rather large and consistent body of empirical evidence indicates that the standards of the profession include no ability to accurately predict dangerous behavior. Not only have psychologists and psychiatrists been unable to predict dangerousness to a degree of accuracy which would justify infringing upon a client's rights, they have been unable to predict any more accurately than have nonprofessionals.

In our opinion, the essence of the duty problem, and our concern, was aptly captured in *Brady v. Hopper*, 570 F.Supp. 1333 (D.Colo.1983). In *Brady*, the plaintiffs were injured by John W. Hinckley, Jr. in Hinckley's attempt to assassinate President Reagan. The suit alleged, in part, that Hinckley's psychiatrist had negligently diagnosed and treated him. The *Brady* court held that the psychiatrist owed no duty to plaintiffs because Hinckley had not made specific threats against a readily identifiable victim. 570 F.Supp. at 1339. In so holding, the court stated that:

[t]o impose upon those in the counseling professions an ill-defined 'duty to control' would require therapists to be ultimately responsible for the actions of their patients. Such a rule would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment. Human behavior is simply too unpredictable, and the field of psychotherapy presently too inexact to so greatly expand the scope of therapist's liability. In my opinion, the 'specific threats to specific victims' rule states a workable, reasonable and fair boundary upon the sphere of the therapist's liability for the acts of their patients.

570 F.2d at 1339.

We agree with the holding in *Brady*. In reaching this conclusion, we are cognizant of the considerations of policy which govern creation or negation of the duty of a psychiatrist toward others when diagnosing and treating a third person. Having reviewed these considerations of policy, we conclude that in the instant case no duty may run from the appellees to plaintiff's decedent absent a showing of a specific threat to a specific victim.

## VENUE

A.R.S. § 12–822(B) mandates that upon written demand of the attorney general, the place of trial of any action against the state in contract or negligence actions shall be changed to Maricopa County. The provision is mandatory. Additionally,

when a change of venue has been made pursuant to A.R.S. § 12–822(B) and the state remains a party, the action is not subject to the venue provisions of A.R.S. § 12–406. *Johnson v. University Hospital,* 148 Ariz. 37, 712 P.2d 950 (App.1985). Appellant argues that our opinion in *Johnson* should be reconsidered. We decline to do so.

Appellant also argues that assuming that A.R.S. § 12–822(B) is controlling, the statute is unconstitutional in that it is violative of the due process and equal protection clauses of the federal and state constitutions. As previously stated in *Johnson v. University Hospital,* we read the Arizona Supreme Court decision in *State v. Superior Court,* 120 Ariz. 273, 585 P.2d 882 (1978) as, at least impliedly, upholding the constitutionality of § 12–822(B). 148 Ariz. at 43, 712 P.2d at 956. *See also Gila Valley Irrigation District v. Superior Court,* 144 Ariz. 288, 697 P.2d 681 (1985). This court lacks authority to disaffirm prior decisions of the Arizona Supreme Court. *Johnson v. University Hospital,* 148 Ariz. at 43, 712 P.2d at 956. Consequently, we do not address the constitutionality issue.

Judgment affirmed.

CONTRERAS, J., concurs.

CORCORAN, Judge, dissenting in part, concurring in part:

### Negligence

I agree with the majority that appellant Cooke, for the purpose of avoiding summary judgment, has raised an issue of fact concerning appellees' failure to meet an appropriate standard of care in the diagnosis and treatment of Robinson's mental condition.

### Duty

I respectfully dissent from the section of the majority opinion dealing with Duty.

This is not a duty to warn case; it is one of negligent diagnosis and treatment. Appellees contend that they owed no duty to Cooke because it was undisputed that Lyle, Dr. Berlin, and Bussanich did not know that Robinson had dangerous propensities, nor did Robinson inform them of any intent to harm Cooke. However, Lyle and Dr. Berlin gratuitously involved Cooke in their professional dealings with Robinson's mental problems by contacting him to arrange a meeting between Robinson and Cooke. Cooke refused, and Robinson was informed of this rejection by Cooke. Although it was clear that Cooke was the focus of Robinson's delusions, Dr. Berlin did not probe Robinson to determine what degree of hostility or anger she directed at Cooke, or the degree of the threat she perceived he posed to her.

Appellant argues that the legal duty in this case is not governed by the rule of "specific threats to specific victims" because she is not premising liability on the "failure to warn" but upon *negligent diagnosis and treatment.* She asserts that SAMHC and Dr. Berlin owed a duty to any third party foreseeably at risk from negligent performance of psychiatric services to Robinson. She argues that psychotherapists, like other physicians, owe a duty to the public akin to the following recognized duties: liability to persons infected by their patients for failing to diagnose a contagious disease; liability to persons injured in an automobile accident for negligently diagnosing and treating a patient who had a seizure while driving a car; liability to persons injured by a driver for prescribing a drug, the effect of which contributed to causing a collision.

Appellant also argues that a duty to third persons to diagnose and treat a patient in a non-negligent manner finds its basis in *Restatement (Second) of Torts* § 319 (1965), which provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Although cases basing liability upon this provision generally involve custodial situations, appellant Cooke argues that appellees took charge of Robinson by accepting her as an outpatient at SAMHC and under-

taking treatment. Additionally, she argues that had appellees performed their professional services in a non-negligent manner, they should have known that Robinson suffered from "atypical psychosis" which rendered her likely to do bodily harm. Finally, appellant argues that had Robinson's condition been properly diagnosed and treated, she would not have killed Robert Cooke.

I recognize the reluctance of courts to impose a duty upon psychotherapists to prevent a patient from doing harm to an unknown third party. Much of this concern stems from the inherent difficulty, some contend impossibility, in predicting dangerousness under such circumstances. It is also grounded in the recognition of the inexactness of diagnosing mental illness as compared with physical ailments. However, this difficulty alone does not justify barring recovery in all situations. As the California court stated in interpreting *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976):

> A negligent failure to diagnose dangerousness in a *Tarasoff* action is as much a basis for liability as is a negligent failure to warn a known victim once such diagnosis has been made....

*Hedlund v. Superior Court*, 34 Cal.3d 695, 703, 669 P.2d 41, 45, 194 Cal.Rptr. 805, 809 (1983).

The difficulties in diagnosing or predicting behavior are more properly addressed in determining whether *particular conduct* was negligent rather than in determining whether a duty exists. The standard of care of mental health professionals must take into account the difficulty in making a definitive diagnosis of mental illness and prognosis of dangerousness. *See Hicks v. United States*, 511 F.2d 407, 415 (D.C.Cir.1975); *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185, 192 (D.Neb. 1980); *Peck v. Counseling Service*, 146 Vt. 61, 66, 499 A.2d 422, 425 (1985). Appellant is not arguing merely an error in medical judgment with respect to SAMHC and Dr. Berlin's treatment of Robinson; rather, she is alleging failure to perform a competent examination. Liability can arise from such

failure. *Revels v. Pohle*, 101 Ariz. 208, 418 P.2d 364 (1966). *See Bell v. New York City Health & Hosp.*, 90 A.D.2d 270, 456 N.Y.S.2d 787 (1982).

In *Coburn v. City of Tucson*, 143 Ariz. 50, 691 P.2d 1078 (1984), our supreme court expressed disapproval of attempts to equate duty with specific details of conduct. The court approved the analysis from W. Prosser and W. Keeton, *Law of Torts* § 53 at 356 (5th ed. 1984), which defines duty as follows:

> "[D]uty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.

In *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 355, 706 P.2d 364, 367 (1985), our supreme court once again expressly and unequivocally pointed out for our benefit and that of the trial courts that "the existence of duty is not to be confused with the details of the standard of conduct."

Consistent with the analysis of duty by our supreme court are those cases which have viewed the duty owed to others by a psychotherapist as a duty to take reasonable precautions to protect anyone who might reasonably be endangered by their patient. I would reject *Brady v. Hopper*, 570 F.Supp. 1333 (D.Colo.1983). Instead, I would adopt the approach taken in *Lipari v. Sears, Roebuck & Co.*, in which the court held:

> It is not unfair to require the psychotherapist to take those precautions which would be taken by a reasonable therapist under similar circumstances. Moreover, this Court refuses to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings.... These issues can only be determined after the parties have had an opportunity to prove what precautions a reasonable psychotherapist

would take under the circumstances in issue here.

497 F.Supp. at 193. *Cf. Tarasoff,* 17 Cal.3d at 439, 551 P.2d at 345–46, 131 Cal.Rptr. at 25.

I conclude that appellant Cooke presented sufficient substantial evidence of a relationship between Robinson and appellees that gave rise to a duty to protect others who were foreseeably at risk from negligent performance of their services to Robinson.

## Venue

I concur with the majority in the section dealing with Venue but wish to make additional remarks.

All relevant factors indicate that the logical venue of this case should be Pima County. But for the change of venue statute, permitting the Attorney General to demand that venue be Maricopa County, A.R.S. § 12–822(B), the venue of this case would be Pima County. All of the incidents alleged in the complaint occurred in Tucson. Robinson resides in Tucson. The state facility, Southern Arizona Mental Health Center, where Robinson was treated, is located in Tucson. Every counselor, psychologist and each employee who attended Robinson resides in Tucson. All medical records and other documents material to this case are located in Tucson. Almost all witnesses who may be called to testify at trial reside in Tucson. It would appear that "the convenience of witnesses and the ends of justice would be promoted" by trial in Tucson. *See* A.R.S. § 12–406(B)(2).

Dr. Berlin practices and lives in Tucson, as does his attorney. Dr. Berlin and Robinson (who was represented by pro bono counsel) both joined with appellant Cooke as petitioners in petitioning the supreme court to grant a special action on the venue issue seeking trial in Tucson. In the special action in the supreme court (No. 17368–SA), the Attorney General appeared on behalf of the state. The Attorney General's Response disagreed with the proposition that "just any lawyer can adequately try a

personal injury suit" and stated that "because of the absolute vital importance of the proper presentation of evidence to a jury, specialization in the personal injury field has occurred and trained experienced attorneys are vital to the defense of a lawsuit." The Attorney General pointedly stated:

> The division of the Attorney General's Office charged with defending the State and its agencies in personal injury litigation is the Liability Defense Division. This division currently [February 7, 1984] consists of five attorneys, all of whom are officed in Maricopa County. The Attorney General's Office would emphasize that no Liability Defense Division attorneys are officed in Pima County or in any other county in the State of Arizona.

The Response indicated that the nine attorneys in the Tucson office specialized in fields other than personal injury, and that the Attorney General had offices only in Phoenix and Tucson.

The supreme court declined to accept jurisdiction of the petition for special action on March 20, 1985. Within six months, the Attorney General "associated" private contract counsel to represent the state.

The state, through private counsel * contracted for by the Attorney General, indicates that there is "a rational basis" for the authority given to the Attorney General in A.R.S. § 12–822(B). I will set forth a summary of the "rational basis" arguments made by the state and some observations relating to them.

A "rational basis" for the statute asserted by the state is that it is for the "convenience of the state." The state does not elucidate what the convenience is, or for that matter, what the inconvenience of trial in Tucson would be. Phoenix is the capital, but the Attorney General also has an office in Tucson. Phoenix is as far from Tucson as Tucson is from Phoenix. The state does not claim that the attorneys available to represent the state in counties other than

---

* Although the lead of this case lists the Attorney General as co-counsel, the Attorney General has not appeared in this court and has not signed the answering brief.

**230**

Maricopa are less able or that their offices are somehow further from the courthouse.

The state also argues that "minimization of expense to the public" is a rational basis. However, the state does not set forth how it is less expensive for the Attorney General to hire a Phoenix law firm to defend a case in Phoenix as opposed to hiring a Tucson law firm to defend the case in Tucson. The state does not develop its statement that somehow venue in Phoenix "minimize[s] expenditure of effort and public funds."

The state asserts that venue in Maricopa County provides "uniformity of rulings" and "uniform interpretation of rulings." Again, the state does not elucidate. There are over 50 superior court judges and an additional number of court commissioners and judges *pro tempore* in Phoenix who may try this case. It is ludicrous to argue that only efficient and uniform rulings can be obtained in Maricopa County, and not in Pima County. The state does *not* claim that justice is more just in Phoenix, or even that it is quicker.

The state alleges that "countless litigants" sue the state on all sorts of grounds, and that A.R.S. § 12-822(B) provides a method to "centralize these countless claims so that they can be handled, efficiently, professionally and cost-effectively by the Attorney General." The Attorney General is not handling this case! Contract attorneys are handling it! The state does not set forth what the benefit is to having a number of different Phoenix contract attorneys handling these "countless claims" in many different courtrooms in Phoenix. Nor has it demonstrated how this leads to efficiency or higher professional standards. The blank assertion that it is "cost effective" is simply a matter of conjecture. The state does not set forth how Tucson contract counsel (or even Phoenix contract counsel, or the office of the Attorney General in Phoenix or Tucson) processing this case in Tucson would be less efficient, less professional or less cost-effective than with present representation and Maricopa County venue.

The only function that A.R.S. § 12-822(B) seems to serve is to provide a ve-

hicle to bring cases to Maricopa County from divers parts of the state in which Phoenix law firms then represent the state's interest. Both the Attorney General, which is reputed to be the largest law firm in the state, and other law firms it hires in Phoenix, certainly have the competence and capability to practice law anywhere in the state. The attorneys from all of these offices regularly make appearances in cases throughout the state of Arizona. There are attorneys throughout the state who can competently and efficiently represent the state. There are judges and juries throughout the state who can fairly try any issues involving the state.

It would seem appropriate that the supreme court revisit the constitutional issues raised in this case, or that the legislature reconsider the policy of conveniencing the Attorney General when the result is concomitantly to retain Phoenix law firms to represent the state and inconvenience everyone else involved in the litigation. *See* Cal.Civ.Proc.Code § 401 (West 1973) (the California statute from which A.R.S. § 12-822(B) was originally taken now provides for venue in suits against the state "in any city ... of this State in which the Attorney General has an office").